482 U.S. 522 (1987)
SOCIETE NATIONALE INDUSTRIELLE AEROSPATIALE ET AL.
v.
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA
No. 85-1695.
Supreme Court of United States.
Argued January 14, 1987
Decided June 15, 1987
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT
*523 John W. Ford argued the cause for petitioners. With him on the briefs were Stephen C. Johnson, Lawrence N. Minch, and William L. Robinson.
Jeffrey P. Minear argued the cause for the United States et al. as amici curiae. With him on the brief were Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Lauber, Deputy Assistant Attorney General Spears, David Epstein, Abraham D. Sofaer, and Daniel L. Goelzer.
Richard H. Doyle IV argued the cause for respondent. With him on the brief were Verne Lawyer, Roland D. Peddicord, and Thomas C. Farr.[*]
Paul A. Nalty, Derek A. Walker, and Kenneth J. Servay filed a brief for Compania Gijonesa de Navigacion, S. A., as amicus curiae urging affirmance.
Richard L. Mattiaccio and David A. Botwinik filed a brief for the Italy-America Chamber of Commerce, Inc., as amicus curiae.
*524 JUSTICE STEVENS delivered the opinion of the Court.
The United States, the Republic of France, and 15 other Nations have acceded to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970, 23 U. S. T. 2555, T. I. A. S. No. 7444.[1] This Convention  sometimes referred to as the "Hague Convention" or the "Evidence Convention"  prescribes certain procedures by which a judicial authority in one contracting state may request evidence located in another contracting state. The question presented in this case concerns the extent to which a federal district court must employ the procedures set forth in the Convention when litigants seek answers to interrogatories, the production of documents, and admissions from a French adversary over whom the court has personal jurisdiction.

I
The two petitioners are corporations owned by the Republic of France.[2] They are engaged in the business of designing, *525 manufacturing, and marketing aircraft. One of their planes, the "Rallye," was allegedly advertised in American aviation publications as "the World's safest and most economical STOL plane."[3] On August 19, 1980, a Rallye crashed in Iowa, injuring the pilot and a passenger. Dennis Jones, John George, and Rosa George brought separate suits based upon this accident in the United States District Court for the Southern District of Iowa, alleging that petitioners had manufactured and sold a defective plane and that they were guilty of negligence and breach of warranty. Petitioners answered the complaints, apparently without questioning the jurisdiction of the District Court. With the parties' consent, the cases were consolidated and referred to a Magistrate. See 28 U. S. C. § 636(c)(1).
Initial discovery was conducted by both sides pursuant to the Federal Rules of Civil Procedure without objection.[4] When plaintiffs[5] served a second request for the production of documents pursuant to Rule 34, a set of interrogatories pursuant to Rule 33, and requests for admission pursuant to Rule 36, however, petitioners filed a motion for a protective order. App. 27-37. The motion alleged that because petitioners are "French corporations, and the discovery sought *526 can only be found in a foreign state, namely France," the Hague Convention dictated the exclusive procedures that must be followed for pretrial discovery. App. 2. In addition, the motion stated that under French penal law, the petitioners could not respond to discovery requests that did not comply with the Convention. Ibid.[6]
The Magistrate denied the motion insofar as it related to answering interrogatories, producing documents, and making admissions.[7] After reviewing the relevant cases, the Magistrate explained:
"To permit the Hague Evidence Convention to override the Federal Rules of Civil Procedure would frustrate the courts' interests, which particularly arise in products liability *527 cases, in protecting United States citizens from harmful products and in compensating them for injuries arising from use of such products." App. to Pet. for Cert. 25a.
The Magistrate made two responses to petitioners' argument that they could not comply with the discovery requests without violating French penal law. Noting that the law was originally " `inspired to impede enforcement of United States antitrust laws,' "[8] and that it did not appear to have been strictly enforced in France, he first questioned whether it would be construed to apply to the pretrial discovery requests at issue.[9]Id., at 22a-24a. Second, he balanced the interests in the "protection of United States citizens from harmful foreign products and compensation for injuries caused by such products" against France's interest in protecting its citizens "from intrusive foreign discovery procedures." The Magistrate concluded that the former interests were stronger, particularly because compliance with the requested discovery will "not have to take place in France" and will not be greatly intrusive or abusive. Id., at 23a-25a.
Petitioners sought a writ of mandamus from the Court of Appeals for the Eighth Circuit under Federal Rule of Appellate Procedure 21(a). Although immediate appellate review of an interlocutory discovery order is not ordinarily available, see Kerr v. United States District Court, 426 U. S. 394, *528 402-403 (1976), the Court of Appeals considered that the novelty and the importance of the question presented, and the likelihood of its recurrence, made consideration of the merits of the petition appropriate. 782 F. 2d 120 (1986). It then held that "when the district court has jurisdiction over a foreign litigant the Hague Convention does not apply to the production of evidence in that litigant's possession, even though the documents and information sought may physically be located within the territory of a foreign signatory to the Convention." Id., at 124. The Court of Appeals disagreed with petitioners' argument that this construction would render the entire Hague Convention "meaningless," noting that it would still serve the purpose of providing an improved procedure for obtaining evidence from nonparties. Id., at 125. The court also rejected petitioners' contention that considerations of international comity required plaintiffs to resort to Hague Convention procedures as an initial matter ("first use"), and correspondingly to invoke the federal discovery rules only if the treaty procedures turned out to be futile. The Court of Appeals believed that the potential overruling of foreign tribunals' denial of discovery would do more to defeat than to promote international comity. Id., at 125-126. Finally, the Court of Appeals concluded that objections based on the French penal statute should be considered in two stages: first, whether the discovery order was proper even though compliance may require petitioners to violate French law; and second, what sanctions, if any, should be imposed if petitioners are unable to comply. The Court of Appeals held that the Magistrate properly answered the first question and that it was premature to address the second.[10] The court *529 therefore denied the petition for mandamus. We granted certiorari. 476 U. S. 1168 (1986).

II
In the District Court and the Court of Appeals, petitioners contended that the Hague Evidence Convention "provides the exclusive and mandatory procedures for obtaining documents and information located within the territory of a foreign signatory." 782 F. 2d, at 124.[11] We are satisfied that the Court of Appeals correctly rejected this extreme position. We believe it is foreclosed by the plain language of the Convention. Before discussing the text of the Convention, however, we briefly review its history.
The Hague Conference on Private International Law, an association of sovereign states, has been conducting periodic sessions since 1893. S. Exec. Doc. A, 92d Cong., 2d Sess., p. V (1972) (S. Exec. Doc. A). The United States participated in those sessions as an observer in 1956 and 1960, and as a member beginning in 1964 pursuant to congressional authorization.[12] In that year Congress amended the Judicial Code to grant foreign litigants, without any requirement of reciprocity, special assistance in obtaining evidence in the *530 United States.[13] In 1965 the Hague Conference adopted a Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Service Convention), 20 U. S. T. 361, T. I. A. S. No. 6638, to which the Senate gave its advice and consent in 1967. The favorable response to the Service Convention, coupled with the longstanding interest of American lawyers in improving procedures for obtaining evidence abroad, motivated the United States to take the initiative in proposing that an evidence convention be adopted. Statement of Carl F. Salans, Deputy Legal Adviser, Department of State, Convention on Taking of Evidence Abroad, S. Exec. Rep. No. 92-25, p. 3 (1972). The Conference organized a special commission to prepare the draft convention, and the draft was approved without a dissenting vote on October 26, 1968. S. Exec. Doc. A, p. V. It was signed on behalf of the United States in 1970 and ratified by a unanimous vote of the Senate in 1972.[14] The Convention's purpose was to establish a system for obtaining evidence located abroad that would be "tolerable" to the state executing the request and would produce evidence "utilizable" in the requesting state. Amram, Explanatory Report on the Convention on the Taking of Evidence *531 Abroad in Civil or Commercial Matters, in S. Exec. Doc. A, p. 11.
In his letter of transmittal recommending ratification of the Convention, the President noted that it was "supported by such national legal organizations as the American Bar Association, the Judicial Conference of the United States, the National Conference of Commissions on Uniform State Laws, and by a number of State, local, and specialized bar associations." S. Exec. Doc. A, p. III. There is no evidence of any opposition to the Convention in any of those organizations. The Convention was fairly summarized in the Secretary of State's letter of submittal to the President:
"The willingness of the Conference to proceed promptly with work on the evidence convention is perhaps attributable in large measure to the difficulties encountered by courts and lawyers in obtaining evidence abroad from countries with markedly different legal systems. Some countries have insisted on the exclusive use of the complicated, dilatory and expensive system of letters rogatory or letters of request. Other countries have refused adequate judicial assistance because of the absence of a treaty or convention regulating the matter. The substantial increase in litigation with foreign aspects arising, in part, from the unparalleled expansion of international trade and travel in recent decades had intensified the need for an effective international agreement to set up a model system to bridge differences between the common law and civil law approaches to the taking of evidence abroad.
"Civil law countries tend to concentrate on commissions rogatoires, while common law countries take testimony on notice, by stipulation and through commissions to consuls or commissioners. Letters of request for judicial assistance from courts abroad in securing needed evidence have been the exception, rather than the rule. The civil law technique results normally in a resume of *532 the evidence, prepared by the executing judge and signed by the witness, while the common law technique results normally in a verbatim transcript of the witness's testimony certified by the reporter.
"Failure by either the requesting state or the state of execution fully to take into account the differences of approach to the taking of evidence abroad under the two systems and the absence of agreed standards applicable to letters of request have frequently caused difficulties for courts and litigants. To minimize such difficulties in the future, the enclosed convention, which consists of a preamble and forty-two articles, is designed to:
"1. Make the employment of letters of request a principal means of obtaining evidence abroad;
"2. Improve the means of securing evidence abroad by increasing the powers of consuls and by introducing in the civil law world, on a limited basis, the concept of the commissioner;
"3. Provide means for securing evidence in the form needed by the court where the action is pending; and
"4. Preserve all more favorable and less restrictive practices arising from internal law, internal rules of procedure and bilateral or multilateral conventions.
"What the convention does is to provide a set of minimum standards with which contracting states agree to comply. Further, through articles 27, 28 and 32, it provides a flexible framework within which any future liberalizing changes in policy and tradition in any country with respect to international judicial cooperation may be translated into effective change in international procedures. At the same time it recognizes and preserves procedures of every country which now or hereafter may provide international cooperation in the taking of evidence on more liberal and less restrictive bases, whether this is effected by supplementary agreements or by municipal law and practice." Id., p. VI.

*533 III
In arguing their entitlement to a protective order, petitioners correctly assert that both the discovery rules set forth in the Federal Rules of Civil Procedure and the Hague Convention are the law of the United States. Brief for Petitioners 31. This observation, however, does not dispose of the question before us; we must analyze the interaction between these two bodies of federal law. Initially, we note that at least four different interpretations of the relationship between the federal discovery rules and the Hague Convention are possible. Two of these interpretations assume that the Hague Convention by its terms dictates the extent to which it supplants normal discovery rules. First, the Hague Convention might be read as requiring its use to the exclusion of any other discovery procedures whenever evidence located abroad is sought for use in an American court. Second, the Hague Convention might be interpreted to require first, but not exclusive, use of its procedures. Two other interpretations assume that international comity, rather than the obligations created by the treaty, should guide judicial resort to the Hague Convention. Third, then, the Convention might be viewed as establishing a supplemental set of discovery procedures, strictly optional under treaty law, to which concerns of comity nevertheless require first resort by American courts in all cases. Fourth, the treaty may be viewed as an undertaking among sovereigns to facilitate discovery to which an American court should resort when it deems that course of action appropriate, after considering the situations of the parties before it as well as the interests of the concerned foreign state.
In interpreting an international treaty, we are mindful that it is "in the nature of a contract between nations," Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U. S. 243, 253 (1984), to which "[g]eneral rules of construction apply." Id., at 262. See Ware v. Hylton, 3 Dall. 199, 240-241 (1796) *534 (opinion of Chase, J.). We therefore begin "with the text of the treaty and the context in which the written words are used." Air France v. Saks, 470 U. S. 392, 397 (1985). The treaty's history, " `the negotiations, and the practical construction adopted by the parties' " may also be relevant. Id., at 396 (quoting Choctaw Nation of Indians v. United States, 318 U. S. 423, 431-432 (1943)).
We reject the first two of the possible interpretations as inconsistent with the language and negotiating history of the Hague Convention. The preamble of the Convention specifies its purpose "to facilitate the transmission and execution of Letters of Request" and to "improve mutual judicial co-operation in civil or commercial matters." 23 U. S. T., at 2557, T. I. A. S. No. 7444. The preamble does not speak in mandatory terms which would purport to describe the procedures for all permissible transnational discovery and exclude all other existing practices.[15] The text of the Evidence Convention itself does not modify the law of any contracting state, require any contracting state to use the Convention procedures, either in requesting evidence or in responding to such requests, or compel any contracting state to change its own evidence-gathering procedures.[16]
*535 The Convention contains three chapters. Chapter I, entitled "Letters of Requests," and chapter II, entitled "Taking of Evidence by Diplomatic Officers, Consular Agents and Commissioners," both use permissive rather than mandatory language. Thus, Article 1 provides that a judicial authority in one contracting state "may" forward a letter of request to the competent authority in another contracting state for the purpose of obtaining evidence.[17] Similarly, Articles 15, 16, and 17 provide that diplomatic officers, consular agents, and commissioners "may . . . without compulsion," take evidence under certain conditions.[18] The absence of any command that a contracting state must use Convention procedures when they are not needed is conspicuous.[19]
*536 Two of the Articles in chapter III, entitled "General Clauses," buttress our conclusion that the Convention was intended as a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad.[20] Article 23 expressly authorizes a contracting state to declare that it will not execute any letter of request in aid of pretrial discovery of documents in a common-law country.[21] Surely, if the Convention had been intended to replace completely the broad discovery powers that the common-law courts in the United States previously exercised over foreign litigants subject to their jurisdiction, it would have been most anomalous for the common-law contracting parties to agree to *537 Article 23, which enables a contracting party to revoke its consent to the treaty's procedures for pretrial discovery.[22] In the absence of explicit textual support, we are unable to accept the hypothesis that the common-law contracting states abjured recourse to all pre-existing discovery procedures at the same time that they accepted the possibility that a contracting party could unilaterally abrogate even the Convention's procedures.[23] Moreover, Article 27 plainly states that *538 the Convention does not prevent a contracting state from using more liberal methods of rendering evidence than those authorized by the Convention.[24] Thus, the text of the Evidence Convention, as well as the history of its proposal and ratification by the United States, unambiguously supports the conclusion that it was intended to establish optional procedures that would facilitate the taking of evidence abroad. See Amram, The Proposed Convention on the Taking of Evidence Abroad, 55 A. B. A. J. 651, 655 (1969); President's Letter of Transmittal, Sen. Exec. Doc. A, p. III.
*539 An interpretation of the Hague Convention as the exclusive means for obtaining evidence located abroad would effectively subject every American court hearing a case involving a national of a contracting state to the internal laws of that state. Interrogatories and document requests are staples of international commercial litigation, no less than of other suits, yet a rule of exclusivity would subordinate the court's supervision of even the most routine of these pretrial proceedings to the actions or, equally, to the inactions of foreign judicial authorities. As the Court of Appeals for the Fifth Circuit observed in In re Anschuetz & Co., GmbH, 754 F. 2d 602, 612 (1985), cert. pending, No. 85-98:
"It seems patently obvious that if the Convention were interpreted as preempting interrogatories and document requests, the Convention would really be much more than an agreement on taking evidence abroad. Instead, the Convention would amount to a major regulation of the overall conduct of litigation between nationals of different signatory states, raising a significant possibility of very serious interference with the jurisdiction of United States courts.
.....
"While it is conceivable that the United States could enter into a treaty giving other signatories control over litigation instituted and pursued in American courts, a treaty intended to bring about such a curtailment of the rights given to all litigants by the federal rules would surely state its intention clearly and precisely identify crucial terms."
The Hague Convention, however, contains no such plain statement of a pre-emptive intent. We conclude accordingly that the Hague Convention did not deprive the District Court of the jurisdiction it otherwise possessed to order a foreign *540 national party before it to produce evidence physically located within a signatory nation.[25]

IV
While the Hague Convention does not divest the District Court of jurisdiction to order discovery under the Federal Rules of Civil Procedure, the optional character of the Convention procedures sheds light on one aspect of the Court of Appeals' opinion that we consider erroneous. That court concluded that the Convention simply "does not apply" to discovery sought from a foreign litigant that is subject to the jurisdiction of an American court. 782 F. 2d, at 124. Plaintiffs argue that this conclusion is supported by two considerations. First, the Federal Rules of Civil Procedure provide *541 ample means for obtaining discovery from parties who are subject to the court's jurisdiction, while before the Convention was ratified it was often extremely difficult, if not impossible, to obtain evidence from nonparty witnesses abroad. Plaintiffs contend that it is appropriate to construe the Convention as applying only in the area in which improvement was badly needed. Second, when a litigant is subject to the jurisdiction of the district court, arguably the evidence it is required to produce is not "abroad" within the meaning of the Convention, even though it is in fact located in a foreign country at the time of the discovery request and even though it will have to be gathered or otherwise prepared abroad. See In re Anschuetz & Co., GmbH, 754 F. 2d, at 611; In re Messerschmitt Bolkow Blohm GmbH, 757 F. 2d 729, 731 (CA5 1985), cert. vacated, 476 U. S. 1168 (1986); Daimler-Benz Aktiengesellschaft v. United States District Court, 805 F. 2d 340, 341-342 (CA10 1986).
Nevertheless, the text of the Convention draws no distinction between evidence obtained from third parties and that obtained from the litigants themselves; nor does it purport to draw any sharp line between evidence that is "abroad" and evidence that is within the control of a party subject to the jurisdiction of the requesting court. Thus, it appears clear to us that the optional Convention procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention. Although these procedures are not mandatory, the Hague Convention does "apply" to the production of evidence in a litigant's possession in the sense that it is one method of seeking evidence that a court may elect to employ. See Briefs of Amici Curiae for the United States and the SEC 9-10, the Federal Republic of Germany 5-6, the Republic of France 8-12, and the Government of the United Kingdom and Northern Ireland 8.

V
Petitioners contend that even if the Hague Convention's procedures are not mandatory, this Court should adopt a rule *542 requiring that American litigants first resort to those procedures before initiating any discovery pursuant to the normal methods of the Federal Rules of Civil Procedure. See, e. g., Laker Airways, Ltd. v. Pan American World Airways, 103 F. R. D. 42 (DC 1984); Philadelphia Gear Corp. v. American Pfauter Corp., 100 F. R. D. 58 (ED Pa. 1983). The Court of Appeals rejected this argument because it was convinced that an American court's order ultimately requiring discovery that a foreign court had refused under Convention procedures would constitute "the greatest insult" to the sovereignty of that tribunal. 782 F. 2d, at 125-126. We disagree with the Court of Appeals' view. It is well known that the scope of American discovery is often significantly broader than is permitted in other jurisdictions, and we are satisfied that foreign tribunals will recognize that the final decision on the evidence to be used in litigation conducted in American courts must be made by those courts. We therefore do not believe that an American court should refuse to make use of Convention procedures because of a concern that it may ultimately find it necessary to order the production of evidence that a foreign tribunal permitted a party to withhold.
Nevertheless, we cannot accept petitioners' invitation to announce a new rule of law that would require first resort to Convention procedures whenever discovery is sought from a foreign litigant. Assuming, without deciding, that we have the lawmaking power to do so, we are convinced that such a general rule would be unwise. In many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules.[26] A rule of first resort in all cases would *543 therefore be inconsistent with the overriding interest in the "just, speedy, and inexpensive determination" of litigation in our courts. See Fed. Rule Civ. Proc. 1.
Petitioners argue that a rule of first resort is necessary to accord respect to the sovereignty of states in which evidence is located. It is true that the process of obtaining evidence in a civil-law jurisdiction is normally conducted by a judicial officer rather than by private attorneys. Petitioners contend that if performed on French soil, for example, by an unauthorized person, such evidence-gathering might violate the "judicial sovereignty" of the host nation. Because it is only through the Convention that civil-law nations have given their consent to evidence-gathering activities within their borders, petitioners argue, we have a duty to employ those procedures whenever they are available. Brief for Petitioners 27-28. We find that argument unpersuasive. If such a duty were to be inferred from the adoption of the Convention itself, we believe it would have been described in the text of that document. Moreover, the concept of international comity[27] requires in this context a more particularized analysis of *544 the respective interests of the foreign nation and the requesting nation than petitioners' proposed general rule would generate.[28] We therefore decline to hold as a blanket matter that comity requires resort to Hague Evidence Convention procedures without prior scrutiny in each of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective.[29]
*545 Some discovery procedures are much more "intrusive" than others. In this case, for example, an interrogatory asking petitioners to identify the pilots who flew flight tests in the Rallye before it was certified for flight by the Federal Aviation Administration, or a request to admit that petitioners authorized certain advertising in a particular magazine, is certainly less intrusive than a request to produce all of the "design specifications, line drawings and engineering plans and all engineering change orders and plans and all drawings concerning the leading edge slats for the Rallye type aircraft manufactured by the Defendants." App. 29. Even if a court might be persuaded that a particular document request was too burdensome or too "intrusive" to be granted in full, with or without an appropriate protective order, it might well refuse to insist upon the use of Convention procedures *546 before requiring responses to simple interrogatories or requests for admissions. The exact line between reasonableness and unreasonableness in each case must be drawn by the trial court, based on its knowledge of the case and of the claims and interests of the parties and the governments whose statutes and policies they invoke.
American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses. For example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence. Objections to "abusive" discovery that foreign litigants advance should therefore receive the most careful consideration. In addition, we have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. See Hilton v. Guyot, 159 U. S. 113 (1895). American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication.[30]

*547A VI
In the case before us, the Magistrate and the Court of Appeals correctly refused to grant the broad protective order that petitioners requested. The Court of Appeals erred, however, in stating that the Evidence Convention does not apply to the pending discovery demands. This holding may be read as indicating that the Convention procedures are not even an option that is open to the District Court. It must be recalled, however, that the Convention's specification of duties in executing states creates corresponding rights in requesting states; holding that the Convention does not apply in this situation would deprive domestic litigants of access to evidence through treaty procedures to which the contracting states have assented. Moreover, such a rule would deny the foreign litigant a full and fair opportunity to demonstrate appropriate reasons for employing Convention procedures in the first instance, for some aspects of the discovery process.
Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.
*547B JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE O'CONNOR join, concurring in part and dissenting in part.
Some might well regard the Court's decision in this case as an affront to the nations that have joined the United States in ratifying the Hague Convention on the Taking of Evidence *548 Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970, 23 U. S. T. 2555, T. I. A. S. No. 7444. The Court ignores the importance of the Convention by relegating it to an "optional" status, without acknowledging the significant achievement in accommodating divergent interests that the Convention represents. Experience to date indicates that there is a large risk that the case-by-case comity analysis now to be permitted by the Court will be performed inadequately and that the somewhat unfamiliar procedures of the Convention will be invoked infrequently. I fear the Court's decision means that courts will resort unnecessarily to issuing discovery orders under the Federal Rules of Civil Procedure in a raw exercise of their jurisdictional power to the detriment of the United States' national and international interests. The Court's view of this country's international obligations is particularly unfortunate in a world in which regular commercial and legal channels loom ever more crucial.
I do agree with the Court's repudiation of the positions at both extremes of the spectrum with regard to the use of the Convention. Its rejection of the view that the Convention is not "applicable" at all to this case is surely correct: the Convention clearly applies to litigants as well as to third parties, and to requests for evidence located abroad, no matter where that evidence is actually "produced." The Court also correctly rejects the far opposite position that the Convention provides the exclusive means for discovery involving signatory countries. I dissent, however, because I cannot endorse the Court's case-by-case inquiry for determining whether to use Convention procedures and its failure to provide lower courts with any meaningful guidance for carrying out that inquiry. In my view, the Convention provides effective discovery procedures that largely eliminate the conflicts between United States and foreign law on evidence gathering. I therefore would apply a general presumption that, in most cases, courts should resort first to the Convention *549 procedures.[1] An individualized analysis of the circumstances of a particular case is appropriate only when it appears that it would be futile to employ the Convention or when its procedures prove to be unhelpful.

I
Even though the Convention does not expressly require discovery of materials in foreign countries to proceed exclusively according to its procedures, it cannot be viewed as merely advisory. The Convention was drafted at the request and with the enthusiastic participation of the United States, which sought to broaden the techniques available for the taking of evidence abroad. The differences between discovery practices in the United States and those in other countries are significant, and "[n]o aspect of the extension of the American legal system beyond the territorial frontier of the United States has given rise to so much friction as the request for documents associated with investigation and litigation in the United States." Restatement of Foreign Relations Law of the United States (Revised) § 437, Reporters' Note 1, p. 35 (Tent. Draft No. 7, Apr. 10, 1986). Of particular *550 import is the fact that discovery conducted by the parties, as is common in the United States, is alien to the legal systems of civil-law nations, which typically regard evidence gathering as a judicial function.
The Convention furthers important United States interests by providing channels for discovery abroad that would not be available otherwise. In general, it establishes "methods to reconcile the differing legal philosophies of the Civil Law, Common Law and other systems with respect to the taking of evidence." Rapport de la Commission speciale, 4 Conference de La Haye de droit international prive: Actes et documents de la Onzieme session 55 (1970) (Actes et documents). It serves the interests of both requesting and receiving countries by advancing the following goals:
"[T]he techniques for the taking of evidence must be `utilizable' in the eyes of the State where the lawsuit is pending and must also be `tolerable' in the eyes of the State where the evidence is to be taken." Id., at 56.
The Convention also serves the long-term interests of the United States in helping to further and to maintain the climate of cooperation and goodwill necessary to the functioning of the international legal and commercial systems.
It is not at all satisfactory to view the Convention as nothing more than an optional supplement to the Federal Rules of Civil Procedure, useful as a means to "facilitate discovery" when a court "deems that course of action appropriate." Ante, at 533. Unless they had expected the Convention to provide the normal channels for discovery, other parties to the Convention would have had no incentive to agree to its terms. The civil-law nations committed themselves to employ more effective procedures for gathering evidence within their borders, even to the extent of requiring some common-law practices alien to their systems. At the time of the Convention's enactment, the liberal American policy, which allowed foreigners to collect evidence with ease in the United States, see ante at 529-530, and n. 13, was in place and, because *551 it was not conditioned on reciprocity, there was little likelihood that the policy would change as a result of treaty negotiations. As a result, the primary benefit the other signatory nations would have expected in return for their concessions was that the United States would respect their territorial sovereignty by using the Convention procedures.[2]

II
By viewing the Convention as merely optional and leaving the decision whether to apply it to the court in each individual case, the majority ignores the policies established by the political branches when they negotiated and ratified the treaty. The result will be a duplicative analysis for which courts are not well designed. The discovery process usually concerns discrete interests that a court is well equipped to accommodate  the interests of the parties before the court coupled with the interest of the judicial system in resolving the conflict on the basis of the best available information. When a lawsuit requires discovery of materials located in a foreign nation, however, foreign legal systems and foreign interests *552 are implicated as well. The presence of these interests creates a tension between the broad discretion our courts normally exercise in managing pretrial discovery and the discretion usually allotted to the Executive in foreign matters.
It is the Executive that normally decides when a course of action is important enough to risk affronting a foreign nation or placing a strain on foreign commerce. It is the Executive, as well, that is best equipped to determine how to accommodate foreign interests along with our own.[3] Unlike the courts, "diplomatic and executive channels are, by definition, designed to exchange, negotiate, and reconcile the problems which accompany the realization of national interests within the sphere of international association." Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 235 U. S. App. D. C. 207, 253, 731 F. 2d 909, 955 (1984). The Convention embodies the result of the best efforts of the Executive Branch, in negotiating the treaty, and the Legislative Branch, in ratifying it, to balance competing national interests. As such, the Convention represents a political determination  one that, consistent with the principle of separation of powers, courts should not attempt to second-guess.
Not only is the question of foreign discovery more appropriately considered by the Executive and Congress, but in addition, courts are generally ill equipped to assume the role of balancing the interests of foreign nations with that of our own. Although transnational litigation is increasing, relatively few judges are experienced in the area and the procedures of foreign legal systems are often poorly understood. Wilkey, Transnational Adjudication: A View from the Bench, 18 Int'l Lawyer 541, 543 (1984); Ristau, Overview of International *553 Judicial Assistance, 18 Int'l Lawyer 525, 531 (1984). As this Court recently stated, it has "little competence in determining precisely when foreign nations will be offended by particular acts." Container Corp. v. Franchise Tax Bd., 463 U. S. 159, 194 (1983). A pro-forum bias is likely to creep into the supposedly neutral balancing process[4] and courts not surprisingly often will turn to the more familiar procedures established by their local rules. In addition, it simply is not reasonable to expect the Federal Government or the foreign state in which the discovery will take place to participate in every individual case in order to articulate the broader international and foreign interests that are relevant *554 to the decision whether to use the Convention. Indeed, the opportunities for such participation are limited.[5] Exacerbating these shortcomings is the limited appellate review of interlocutory discovery decisions,[6] which prevents any effective case-by-case correction of erroneous discovery decisions.

III
The principle of comity leads to more definite rules than the ad hoc approach endorsed by the majority. The Court asserts that the concept of comity requires an individualized analysis of the interests present in each particular case before a court decides whether to apply the Convention. See ante, at 543-544. There is, however, nothing inherent in the comity principle that requires case-by-case analysis. The Court frequently has relied upon a comity analysis when it has adopted general rules to cover recurring situations in areas such as choice of forum,[7] maritime law,[8] and sovereign *555 immunity,[9] and the Court offers no reasons for abandoning that approach here.
Comity is not just a vague political concern favoring international cooperation when it is in our interest to do so. Rather it is a principle under which judicial decisions reflect the systemic value of reciprocal tolerance and goodwill. See Maier, Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and International Law, 76 Am. J. Int'l L. 280, 281-285 (1982); J. Story, Commentaries on the Conflict of Laws §§ 35, 38 (8th ed. 1883).[10] As in the choice-of-law analysis, which from the very beginning has been linked to international comity, the threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law. When there is a conflict, a court should seek a reasonable accommodation that reconciles the central concerns of both sets of laws. In doing so, it should perform a tripartite analysis that considers the foreign interests, the interests of the United States, and the mutual interests of all nations in a smoothly functioning international legal regime.[11]
*556 In most cases in which a discovery request concerns a nation that has ratified the Convention there is no need to resort to comity principles; the conflicts they are designed to resolve already have been eliminated by the agreements expressed in the treaty. The analysis set forth in the Restatement (Revised) of Foreign Relations Law of the United States, see ante, at 544, n. 28, is perfectly appropriate for courts to use when no treaty has been negotiated to accommodate the different legal systems. It would also be appropriate if the Convention failed to resolve the conflict in a particular case. The Court, however, adds an additional layer of so-called comity analysis by holding that courts should determine on a case-by-case basis whether resort to the Convention is desirable. Although this analysis is unnecessary in the absence of any conflicts, it should lead courts to the use of the Convention if they recognize that the Convention already has largely accommodated all three categories of interests relevant to a comity analysis  foreign interests, domestic interests, and the interest in a well-functioning international order.

A
I am encouraged by the extent to which the Court emphasizes the importance of foreign interests and by its admonition to lower courts to take special care to respect those interests. See ante, at 546. Nonetheless, the Court's view of the Convention rests on an incomplete analysis of the sovereign interests of foreign states. The Court acknowledges that evidence is normally obtained in civil-law countries by a judicial officer, ante, at 543, but it fails to recognize the significance of that practice. Under the classic view of territorial *557 sovereignty, each state has a monopoly on the exercise of governmental power within its borders and no state may perform an act in the territory of a foreign state without consent.[12] As explained in the Report of United States Delegation to Eleventh Session of the Hague Conference on Private International Law, the taking of evidence in a civil-law country may constitute the performance of a public judicial act by an unauthorized foreign person:
"In drafting the Convention, the doctrine of `judicial sovereignty' had to be constantly borne in mind. Unlike the common-law practice, which places upon the parties to the litigation the duty of privately securing and presenting the evidence at the trial, the civil law considers obtaining of evidence a matter primarily for the courts, with the parties in the subordinate position of assisting the judicial authorities.
"The act of taking evidence in a common-law country from a willing witness, without compulsion and without a breach of the peace, in aid of a foreign proceeding, is a purely private matter, in which the host country has no interest and in which its judicial authorities have normally no wish to participate. To the contrary, the same act in a civil-law country may be a public matter, and may constitute the performance of a public judicial act by an unauthorized foreign person. It may violate the *558 `judicial sovereignty' of the host country, unless its authorities participate or give their consent." 8 Int'l Legal Materials 785, 806 (1969).[13]
Some countries also believe that the need to protect certain underlying substantive rights requires judicial control of the taking of evidence. In the Federal Republic of Germany, for example, there is a constitutional principle of proportionality, pursuant to which a judge must protect personal privacy, commercial property, and business secrets. Interference with these rights is proper only if "necessary to protect other persons' rights in the course of civil litigation." See Meessen, The International Law on Taking Evidence From, Not In, a Foreign State, The Anschutz and Messerschmitt opinions of the United States Court of Appeals for the Fifth Circuit (Mar. 31, 1986), as set forth in App. to Brief for Anschuetz & Co. GmbH and Messerschmitt-Boelkow-Blohm GmbH as Amici Curiae 27a-28a.[14]
*559 The United States recently recognized the importance of these sovereignty principles by taking the broad position that the Convention "must be interpreted to preclude an evidence taking proceeding in the territory of a foreign state party if the Convention does not authorize it and the host country does not otherwise permit it." Brief for United States as Amicus Curiae in Volkswagenwerk Aktiengesellschaft v. Falzon, O. T. 1983, No. 82-1888, p. 6. Now, however, it appears to take a narrower view of what constitutes an "evidence taking procedure," merely stating that "oral depositions on foreign soil . . . are improper without the consent of the foreign nation." Tr. of Oral Arg. 23. I am at a loss to understand why gathering documents or information in a foreign country, even if for ultimate production in the United States, is any less an imposition on sovereignty than the taking of a deposition when gathering documents also is regarded as a judicial function in a civil-law nation.
Use of the Convention advances the sovereign interests of foreign nations because they have given consent to Convention procedures by ratifying them. This consent encompasses discovery techniques that would otherwise impinge on the sovereign interests of many civil-law nations. In the absence of the Convention, the informal techniques provided by Articles 15-22 of the Convention  taking evidence by a diplomatic or consular officer of the requesting state and the use of commissioners nominated by the court of the state where the action is pending  would raise sovereignty issues similar to those implicated by a direct discovery order from a foreign court. "Judicial" activities are occurring on the soil of the sovereign by agents of a foreign state.[15] These voluntary discovery procedures are a great boon to United States litigants *560 and are used far more frequently in practice than is compulsory discovery pursuant to letters of request.[16]
Civil-law contracting parties have also agreed to use, and even to compel, procedures for gathering evidence that are diametrically opposed to civil-law practices. The civil-law system is inquisitional rather than adversarial and the judge normally questions the witness and prepares a written summary of the evidence.[17] Even in common-law countries no system of evidence-gathering resembles that of the United States.[18] Under Article 9 of the Convention, however, a foreign court must grant a request to use a "special method or procedure," which includes requests to compel attendance of *561 witnesses abroad, to administer oaths, to produce verbatim transcripts, or to permit examination of witnesses by counsel for both parties.[19] These methods for obtaining evidence, which largely eliminate conflicts between the discovery procedures of the United States and the laws of foreign systems, have the consent of the ratifying nations. The use of these methods thus furthers foreign interests because discovery can proceed without violating the sovereignty of foreign nations.

B
The primary interest of the United States in this context is in providing effective procedures to enable litigants to obtain evidence abroad. This was the very purpose of the United States' participation in the treaty negotiations and, for the most part, the Convention provides those procedures.
The Court asserts that the letters of request procedure authorized by the Convention in many situations will be "unduly time consuming and expensive." Ante, at 542. The Court offers no support for this statement and until the Convention is used extensively enough for courts to develop experience with it, such statements can be nothing other than speculation.[20] Conspicuously absent from the Court's assessment *562 is any consideration of resort to the Convention's less formal and less time-consuming alternatives  discovery conducted by consular officials or an appointed commissioner. Moreover, unless the costs become prohibitive, saving time and money is not such a high priority in discovery that some additional burden cannot be tolerated in the interest of international goodwill. Certainly discovery controlled by litigants under the Federal Rules of Civil Procedure is not known for placing a high premium on either speed or cost-effectiveness.
There is also apprehension that the Convention procedures will not prove fruitful. Experience with the Convention suggests otherwise  contracting parties have honored their obligation to execute letters of request expeditiously and to use compulsion if necessary. See, e. g., Report on the Work of the Special Commission on the Operation of the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 17 Int'l Legal Materials 1425, 1431, § 5 F (1978) ("[r]efusal to execute turns out to be very infrequent *563 in practice"). By and large, the concessions made by parties to the Convention not only provide United States litigants with a means for obtaining evidence, but also ensure that the evidence will be in a form admissible in court.
There are, however, some situations in which there is legitimate concern that certain documents cannot be made available under Convention procedures. Thirteen nations have made official declarations pursuant to Article 23 of the Convention, which permits a contracting state to limit its obligation to produce documents in response to a letter of request. See ante, at 536, n. 21. These reservations may pose problems that would require a comity analysis in an individual case, but they are not so all-encompassing as the majority implies  they certainly do not mean that a "contracting party could unilaterally abrogate . . . the Convention's procedures." Ante, at 537. First, the reservations can apply only to letters of request for documents. Thus, an Article 23 reservation affects neither the most commonly used informal Convention procedures for taking of evidence by a consul or a commissioner nor formal requests for depositions or interrogatories. Second, although Article 23 refers broadly to "pretrial discovery," the intended meaning of the term appears to have been much narrower than the normal United States usage.[21] The contracting parties for the most part have modified *564 the declarations made pursuant to Article 23 to limit their reach. See 7 Martindale-Hubbell Law Directory (pt. VII) 14-19 (1986).[22] Indeed, the emerging view of this exception to discovery is that it applies only to "requests that lack sufficient specificity or that have not been reviewed for *565 relevancy by the requesting court." Oxman, The Choice Between Direct Discovery and Other Means of Obtaining Evidence Abroad: The Impact of the Hague Evidence Convention, 37 U. Miami L. Rev., at 777. Thus, in practice, a reservation is not the significant obstacle to discovery under the Convention that the broad wording of Article 23 would suggest.[23]
In this particular case, the "French `blocking statute,' " see ante, at 526, n. 6, poses an additional potential barrier to obtaining discovery from France. But any conflict posed by this legislation is easily resolved by resort to the Convention's procedures. The French statute's prohibitions are expressly "subject to" international agreements and applicable laws and it does not affect the taking of evidence under the Convention. See Toms, The French Response to the Extra-territorial Application of United States Antitrust Laws, 15 Int'l Lawyer 585, 593-599 (1981); Heck, Federal Republic of Germany and the EEC, 18 Int'l Lawyer 793, 800 (1984).
The second major United States interest is in fair and equal treatment of litigants. The Court cites several fairness concerns in support of its conclusion that the Convention is not exclusive and apparently fears that a broad endorsement of the use of the Convention would lead to the same "unacceptable asymmetries." See ante, at 540, n. 25. Courts can protect against the first two concerns noted by the majority  that a foreign party to a lawsuit would have a discovery advantage over a domestic litigant because it could obtain the advantages of the Federal Rules of Civil Procedure, and that a foreign company would have an economic *566 competitive advantage because it would be subject to less extensive discovery  by exercising their discretionary powers to control discovery in order to ensure fairness to both parties. A court may "make any order which justice requires" to limit discovery, including an order permitting discovery only on specified terms and conditions, by a particular discovery method, or with limitation in scope to certain matters. Fed. Rule Civ. Proc. 26(c). If, for instance, resort to the Convention procedures would put one party at a disadvantage, any possible unfairness could be prevented by postponing that party's obligation to respond to discovery requests until completion of the foreign discovery. Moreover, the Court's arguments focus on the nationality of the parties, while it is actually the locus of the evidence that is relevant to use of the Convention: a foreign litigant trying to secure evidence from a foreign branch of an American litigant might also be required to resort to the Convention.
The Court's third fairness concern is illusory. It fears that a domestic litigant suing a national of a state that is not a party to the Convention would have an advantage over a litigant suing a national of a contracting state. This statement completely ignores the very purpose of the Convention. The negotiations were proposed by the United States in order to facilitate discovery, not to hamper litigants. Dissimilar treatment of litigants similarly situated does occur, but in the manner opposite to that perceived by the Court. Those who sue nationals of noncontracting states are disadvantaged by the unavailability of the Convention procedures. This is an unavoidable inequality inherent in the benefits conferred by any treaty that is less than universally ratified.
In most instances, use of the Convention will serve to advance United States interests, particularly when those interests are viewed in a context larger than the immediate interest of the litigants' discovery. The approach I propose is not a rigid per se rule that would require first use of the Convention without regard to strong indications that no evidence *567 would be forthcoming. All too often, however, courts have simply assumed that resort to the Convention would be unproductive and have embarked on speculation about foreign procedures and interpretations. See, e. g., International Society for Krishna Consciousness, Inc. v. Lee, 105 F. R. D. 435, 449-450 (SDNY 1984); Graco, Inc. v. Kremlin, Inc., 101 F. R. D. 503, 509-512 (ND Ill. 1984). When resort to the Convention would be futile, a court has no choice but to resort to a traditional comity analysis. But even then, an attempt to use the Convention will often be the best way to discover if it will be successful, particularly in the present state of general inexperience with the implementation of its procedures by the various contracting states. An attempt to use the Convention will open a dialogue with the authorities in the foreign state and in that way a United States court can obtain an authoritative answer as to the limits on what it can achieve with a discovery request in a particular contracting state.

C
The final component of a comity analysis is to consider if there is a course that furthers, rather than impedes, the development of an ordered international system. A functioning system for solving disputes across borders serves many values, among them predictability, fairness, ease of commercial interactions, and "stability through satisfaction of mutual expectations." Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 235 U. S. App. D. C., at 235, 731 F. 2d, at 937. These interests are common to all nations, including the United States.
Use of the Convention would help develop methods for transnational litigation by placing officials in a position to communicate directly about conflicts that arise during discovery, thus enabling them to promote a reduction in those conflicts. In a broader framework, courts that use the Convention will avoid foreign perceptions of unfairness that result when United States courts show insensitivity to the interests *568 safeguarded by foreign legal regimes. Because of the position of the United States, economically, politically, and militarily, many countries may be reluctant to oppose discovery orders of United States courts. Foreign acquiescence to orders that ignore the Convention, however, is likely to carry a price tag of accumulating resentment, with the predictable long-term political cost that cooperation will be withheld in other matters. Use of the Convention is a simple step to take toward avoiding that unnecessary and undesirable consequence.

IV
I can only hope that courts faced with discovery requests for materials in foreign countries will avoid the parochial views that too often have characterized the decisions to date. Many of the considerations that lead me to the conclusion that there should be a general presumption favoring use of the Convention should also carry force when courts analyze particular cases. The majority fails to offer guidance in this endeavor, and thus it has missed its opportunity to provide predictable and effective procedures for international litigants in United States courts. It now falls to the lower courts to recognize the needs of the international commercial system and the accommodation of those needs already endorsed by the political branches and embodied in the Convention. To the extent indicated, I respectfully dissent.
NOTES
[*] Briefs of amici curiae urging reversal were filed for the Government of the United Kingdom of Great Britain and Northern Ireland by Douglas E. Rosenthal, Willard K. Tom, and Bruno A. Ristau; for the Republic of France by George J. Grumbach, Jr.; for the Federal Republic of Germany by Peter Heidenberger; for the Government of Switzerland by Robert E. Herzstein; for Anschuetz & Co., GmbH, et al. by James S. Campbell, David Westin, Carol F. Lee, Neal D. Hobson, Andrew N. Vollmer, and Gerhard Nagorny; and for the Motor Vehicle Manufacturers Association of the United States, Inc., et al. by Michael Hoenig, Herbert Rubin, William H. Crabtree, and Edward P. Good.
[1] The Hague Convention entered into force between the United States and France on October 6, 1974. The Convention is also in force in Barbados, Cyprus, Czechoslovakia, Denmark, Finland, the Federal Republic of Germany, Israel, Italy, Luxembourg, the Netherlands, Norway, Portugal, Singapore, Sweden, and the United Kingdom. Office of the Legal Adviser, United States Dept. of State, Treaties in Force 261-262 (1986).
[2] Petitioner Societe Nationale Industrielle Aerospatiale is wholly owned by the Government of France. Petitioner Societe de Construction d'Avions de Tourisme is a wholly owned subsidiary of Societe Nationale Industrielle Aerospatiale.
[3] App. 22, 24. The term "STOL," an acronym for "short takeoff and landing," "refers to a fixed-wing aircraft that either takes off or lands with only a short horizontal run of the aircraft." Douglas v. United States, 206 Ct. Cl. 96, 99, 510 F. 2d 364, 365, cert. denied, 423 U. S. 825 (1975).
[4] Plaintiffs made certain requests for the production of documents pursuant to Rule 34(b) and for admissions pursuant to Rule 36. App. 19-23. Apparently the petitioners responded to those requests without objection, at least insofar as they called for material or information that was located in the United States. App. to Pet. for Cert. 12a. In turn, petitioners deposed witnesses and parties pursuant to Rule 26, and served interrogatories pursuant to Rule 33 and a request for the production of documents pursuant to Rule 34. App. 13. Plaintiffs complied with those requests.
[5] Although the District Court is the nominal respondent in this mandamus proceeding, plaintiffs are the real respondent parties in interest.
[6] Article 1A of the French "blocking statute," French Penal Code Law No. 80-538, provides:

"Subject to treaties or international agreements and applicable laws and regulations, it is prohibited for any party to request, seek or disclose, in writing, orally or otherwise, economic, commercial, industrial, financial or technical documents or information leading to the constitution of evidence with a view to foreign judicial or administrative proceedings or in connection therewith.
"Art. ler bis.  Sous reserve des traites ou accords internationaux et des lois et reglements en vigueur, il est interdit a toute personne de demander, de rechercher ou de communiquer, par ecrit, oralement ou sous toute autre forme, des documents ou renseignements d'ordre economique, commercial, industriel, financier ou technique tendant a la constitution de preuves en vue de procedures judiciaires ou administratives etrangeres ou dans le cadre de celles-ci."
Article 2 provides:
"The parties mentioned in [Article 1A] shall forthwith inform the competent minister if they receive any request concerning such disclosures.
"Art. 2. Les personnes visees aux articles ler et ler bis sont tenues d'informer sans delai le ministre competent lorsqu'elles se trouvent saisies de toute demande concernant de telles communications." App. to Pet. for Cert. 47a-50a.
[7] Id., at 25a. The Magistrate stated, however, that if oral depositions were to be taken in France, he would require compliance with the Hague Evidence Convention. Ibid.
[8] His quotation was from Toms, The French Response to Extraterritorial Application of United States Antitrust Laws, 15 Int'l Law. 585, 586 (1981).
[9] He relied on a passage in the Toms article stating that "the legislative history [of the Law] shows only that the Law was adopted to protect French interests from abusive foreign discovery procedures and excessive assertions of extraterritorial jurisdiction. Nowhere is there an indication that the Law was to impede litigation preparations by French companies, either for their own defense or to institute lawsuits abroad to protect their interests, and arguably such applications were unintended." App. to Pet. for Cert. 22a-23a (citing Toms, supra, at 598).
[10] "The record before this court does not indicate whether the Petitioners have notified the appropriate French Minister of the requested discovery in accordance with Article 2 of the French Blocking Statute, or whether the Petitioners have attempted to secure a waiver of prosecution from the French government. Because the Petitioners are corporations owned by the Republic of France, they stand in a most advantageous position to receive such a waiver. However, these issues will only be relevant should the Petitioners fail to comply with the magistrate's discovery order, and we need not presently address them." 782 F. 2d, at 127.
[11] The Republic of France likewise takes the following position in this case:

"THE HAGUE CONVENTION IS THE EXCLUSIVE MEANS OF DISCOVERY IN TRANSNATIONAL LITIGATION AMONG THE CONVENTION'S SIGNATORIES UNLESS THE SOVEREIGN ON WHOSE TERRITORY DISCOVERY IS TO OCCUR CHOOSES OTHERWISE." Brief for Republic of France as Amicus Curiae 4.
[12] See S. Exec. Doc. A, p. V; Pub. L. 88-244, 77 Stat. 775 (1963).
[13] As the Rapporteur for the session of the Hague Conference which produced the Hague Evidence Convention stated: "In 1964 Rule 28(b) of the Federal Rules of Civil Procedure and 28 U. S. C. §§ 1781 and 1782 were amended to offer to foreign countries and litigants, without a requirement of reciprocity, wide judicial assistance on a unilateral basis for the obtaining of evidence in the United States. The amendments named the Department of State as a conduit for the receipt and transmission of letters of request. They authorized the use in the federal courts of evidence taken abroad in civil law countries, even if its form did not comply with the conventional formalities of our normal rules of evidence. No country in the world has a more open and enlightened policy." Amram, The Proposed Convention on the Taking of Evidence Abroad, 55 A. B. A. J. 651 (1969).
[14] 118 Cong. Rec. 20623 (1972).
[15] The Hague Conference on Private International Law's omission of mandatory language in the preamble is particularly significant in light of the same body's use of mandatory language in the preamble to the Hague Service Convention, 20 U. S. T. 361, T. I. A. S. No. 6638. Article 1 of the Service Convention provides: "The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." Id., at 362, T. I. A. S. No. 6638. As noted, supra, at 530, the Service Convention was drafted before the Evidence Convention, and its language provided a model exclusivity provision that the drafters of the Evidence Convention could easily have followed had they been so inclined. Given this background, the drafters' election to use permissive language instead is strong evidence of their intent.
[16] At the time the Convention was drafted, Federal Rule of Civil Procedure 28(b) clearly authorized the taking of evidence on notice either in accordance with the laws of the foreign country or in pursuance of the law of the United States.
[17] The first paragraph of Article 1 reads as follows:

"In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act." 23 U. S. T., at 2557, T. I. A. S. 7444.
[18] Thus, Article 17 provides:

"In a civil or commercial matter, a person duly appointed as a commissioner for the purpose may, without compulsion, take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State if 
"(a) a competent authority designated by the State where the evidence is to be taken has given its permission either generally or in the particular case; and
"(b) he complies with the conditions which the competent authority has specified in the permission.
"A Contracting State may declare that evidence may be taken under this Article without its prior permission." Id., at 2565, T. I. A. S. 7444.
[19] Our conclusion is confirmed by the position of the Executive Branch and the Securities and Exchange Commission, which interpret the "language, history, and purposes" of the Hague Convention as indicating "that it was not intended to prescribe the exclusive means by which American plaintiffs might obtain foreign evidence." Brief for United States as Amicus Curiae 9 (citation omitted). "[T]he meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." Sumitomo Shoji America, Inc. v. Avagliano, 457 U. S. 176, 184-185 (1982); see also O'Connor v. United States, 479 U. S. 27, 33 (1986). As a member of the United States delegation to the Hague Conference concluded:

"[The Convention] makes no major changes in United States procedure and requires no major changes in United States legislation or rules. On the other front, it will give the United States courts and litigants abroad enormous aid by providing an international agreement for the taking of testimony, the absence of which has created barriers to our courts and litigants." Amram, Explanatory Report on the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, S. Exec. Doc. A, at pp. 1, 3.
[20] In addition to the Eighth Circuit, other Courts of Appeals and the West Virginia Supreme Court have held that the Convention cannot be viewed as the exclusive means of securing discovery transnationally. See Societe Nationale Industrielle Aerospatiale v. United States District Court, 788 F. 2d 1408, 1410 (CA9 1986); In re Messerschmitt Bolkow Blohm GmbH, 757 F. 2d 729, 731 (CA5 1985), cert. vacated, 476 U. S. 1168 (1986); In re Anschuetz & Co., GmbH, 754 F. 2d 602, 606-615, and n. 7 (CA5 1985), cert. pending, No. 85-98; Gebr. Eickhoff Maschinenfabrik und Eisengieberei mbH v. Starcher, ____ W. Va. ____, ____, 328 S. E. 2d 492, 497-501 (1985).
[21] Article 23 provides:

"A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." 23 U. S. T., at 2568, T. I. A. S. 7444.
[22] Thirteen of the seventeen signatory states have made declarations under Article 23 of the Convention that restrict pretrial discovery of documents. See 7 Martindale-Hubbell Law Directory (pt. VII) 15-19 (1986).
[23] "The great object of an international agreement is to define the common ground between sovereign nations. Given the gulfs of language, culture, and values that separate nations, it is essential in international agreements for the parties to make explicit their common ground on the most rudimentary of matters." Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U. S. 243, 262 (1984) (STEVENS, J., dissenting). The utter absence in the Hague Convention of an exclusivity provision has an obvious explanation: The contracting states did not agree that its procedures were to be exclusive. The words of the treaty delineate the extent of their agreement; without prejudice to their existing rights and practices, they bound themselves to comply with any request for judicial assistance that did comply with the treaty's procedures. See Carter, Obtaining Foreign Discovery and Evidence for Use in Litigation in the United States: Existing Rules and Procedures, 13 Int'l Law. 5, 11, n. 14 (1979) (common-law nations and civil-law jurisdictions have separate traditions of bilateral judicial cooperation; the Evidence Convention "attempts to bridge" the two traditions.)

The separate opinion reasons that the Convention procedures are not optional because unless other signatory states "had expected the Convention to provide the normal channels for discovery, [they] would have had no incentive to agree to its terms." Post, at 550. We find the treaty language that the parties have agreed upon and ratified a surer indication of their intentions than the separate opinion's hypothesis about the expectations of the parties. Both comity and concern for the separation of powers counsel the utmost restraint in attributing motives to sovereign states which have bargained as equals. Indeed, JUSTICE BLACKMUN notes that "the Convention represents a political determination  one that, consistent with the principle of separation of powers, courts should not attempt to second guess." Post, at 552. Moreover, it is important to remember that the evidence-gathering procedures implemented by the Convention would still provide benefits to the signatory states even if the United States were not a party.
[24] Article 27 provides:

"The provisions of the present Convention shall not prevent a Contracting State from 
"(a) declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;
"(b) permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;
"(c) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention." 23 U. S. T., at 2569, T. I. A. S. 7444.
Thus, for example, the United Kingdom permits foreign litigants, by a letter of request, to "apply directly to the appropriate courts in the United Kingdom for judicial assistance" or to seek information directly from parties in the United Kingdom "if, as in this case, the court of origin exercises jurisdiction consistent with accepted norms of international law." Brief for the Government of the United Kingdom and Northern Ireland as Amicus Curiae 6 (footnote omitted). On its face, the term "Contracting State" comprehends both the requesting state and the receiving state. Even if Article 27 is read to apply only to receiving states, see, e. g., Gebr. Eickhoff Maschinenfabrik und Eisengieberei mbH v. Starcher, ____ W. Va., at ____, 328 S. E. 2d, at 499-500, n. 11 (rejecting argument that Article 27 authorizes more liberal discovery procedures by requesting as well as executing states), the treaty's internal failure to authorize more liberal procedures for obtaining evidence would carry no pre-emptive meaning. We are unpersuaded that Article 27 supports a "negative inference" that would curtail the pre-existing authority of a state to obtain evidence in accord with its normal procedures.
[25] The opposite conclusion of exclusivity would create three unacceptable asymmetries. First, within any lawsuit between a national of the United States and a national of another contracting party, the foreign party could obtain discovery under the Federal Rules of Civil Procedure, while the domestic party would be required to resort first to the procedures of the Hague Convention. This imbalance would run counter to the fundamental maxim of discovery that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U. S. 495, 507 (1947).

Second, a rule of exclusivity would enable a company which is a citizen of another contracting state to compete with a domestic company on uneven terms, since the foreign company would be subject to less extensive discovery procedures in the event that both companies were sued in an American court. Petitioners made a voluntary decision to market their products in the United States. They are entitled to compete on equal terms with other companies operating in this market. But since the District Court unquestionably has personal jurisdiction over petitioners, they are subject to the same legal constraints, including the burdens associated with American judicial procedures, as their American competitors. A general rule according foreign nationals a preferred position in pretrial proceedings in our courts would conflict with the principle of equal opportunity that governs the market they elected to enter.
Third, since a rule of first use of the Hague Convention would apply to cases in which a foreign party is a national of a contracting state, but not to cases in which a foreign party is a national of any other foreign state, the rule would confer an unwarranted advantage on some domestic litigants over others similarly situated.
[26] We observe, however, that in other instances a litigant's first use of the Hague Convention procedures can be expected to yield more evidence abroad more promptly than use of the normal procedures governing pretrial civil discovery. In those instances, the calculations of the litigant will naturally lead to a first-use strategy.
[27] Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states. This Court referred to the doctrine of comity among nations in Emory v. Grenough, 3 Dall. 369, 370, n. (1797) (dismissing appeal from judgment for failure to plead diversity of citizenship, but setting forth an extract from a treatise by Ulrich Huber (1636-1694), a Dutch jurist):

" `By the courtesy of nations, whatever laws are carried into execution, within the limits of any government, are considered as having the same effect every where, so far as they do not occasion a prejudice to the rights of the other governments, or their citizens.
.....
" `[N]othing would be more inconvenient in the promiscuous intercourse and practice of mankind, than that what was valid by the laws of one place, should be rendered of no effect elsewhere, by a diversity of law. . . .' " Ibid. (quoting 2 U. Huber, Praelectiones Juris Romani et hodiemi, bk. 1, tit. 3, pp. 26-31 (C. Thomas, L. Menke, & G. Gebauer eds. 1725)).
See also Hilton v. Guyot, 159 U. S. 113, 163-164 (1895):
" `Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."
[28] The nature of the concerns that guide a comity analysis is suggested by the Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c) (Tent. Draft No. 7, 1986) (approved May 14, 1986) (Restatement). While we recognize that § 437 of the Restatement may not represent a consensus of international views on the scope of the district court's power to order foreign discovery in the face of objections by foreign states, these factors are relevant to any comity analysis:

"(1) the importance to the . . . litigation of the documents or other information requested;
"(2) the degree of specificity of the request;
"(3) whether the information originated in the United States;
"(4) the availability of alternative means of securing the information; and
"(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Ibid.
[29] The French "blocking statute," n. 6, supra, does not alter our conclusion. It is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute. See Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U. S. 197, 204-206 (1958). Nor can the enactment of such a statute by a foreign nation require American courts to engraft a rule of first resort onto the Hague Convention, or otherwise to provide the nationals of such a country with a preferred status in our courts. It is clear that American courts are not required to adhere blindly to the directives of such a statute. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge, forbidding him or her to order any discovery from a party of French nationality, even simple requests for admissions or interrogatories that the party could respond to on the basis of personal knowledge. It would be particularly incongruous to recognize such a preference for corporations that are wholly owned by the enacting nation. Extraterritorial assertions of jurisdiction are not one-sided. While the District Court's discovery orders arguably have some impact in France, the French blocking statute asserts similar authority over acts to take place in this country. The lesson of comity is that neither the discovery order nor the blocking statute can have the same omnipresent effect that it would have in a world of only one sovereign. The blocking statute thus is relevant to the court's particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material.

The American Law Institute has summarized this interplay of blocking statutes and discovery orders: "[W]hen a state has jurisdiction to prescribe and its courts have jurisdiction to adjudicate, adjudication should (subject to generally applicable rules of evidence) take place on the basis of the best information available. . . . [Blocking] statutes that frustrate this goal need not be given the same deference by courts of the United States as substantive rules of law at variance with the law of the United States." See Restatement § 437, Reporter's Note 5, pp. 41, 42. "On the other hand, the degree of friction created by discovery requests . . . and the differing perceptions of the acceptability of American-style discovery under national and international law, suggest some efforts to moderate the application abroad of U. S. procedural techniques, consistent with the overall principle of reasonableness in the exercise of jurisdiction." Id., at 42.
[30] Under the Hague Convention, a letter of request must specify "the evidence to be obtained or other judicial act to be performed," Art. 3, and must be in the language of the executing authority or be accompanied by a translation into that language. Art. 4, 23 U. S. T., at 2558-2559, T. I. A. S. 7444. Although the discovery request must be specific, the party seeking discovery may find it difficult or impossible to determine in advance what evidence is within the control of the party urging resort to the Convention and which parts of that evidence may qualify for international judicial assistance under the Convention. This information, however, is presumably within the control of the producing party from which discovery is sought. The district court may therefore require, in appropriate situations, that this party bear the burden of providing translations and detailed descriptions of relevant documents that are needed to assure prompt and complete production pursuant to the terms of the Convention.
[1] Many courts that have examined the issue have adopted a rule of first resort to the Convention. See, e. g., Philadelphia Gear Corp. v. American Pfauter Corp. 100 F. R. D. 58, 61 (ED Pa. 1983) ("avenue of first resort for plaintiff [is] the Hague Convention"); Gebr. Eickhoff Maschinenfabrik und Eisengieberei mbH v. Starcher, ____ W. Va. ____, ____, 328 S. E. 2d 492, 504-506 (1985) ("principle of international comity dictates first resort to [Convention] procedures"); Vincent v. Ateliers de la Motobecane, S. A., 193 N. J. Super. 716, 723, 475 A. 2d 686, 690 (App. Div. 1984) (litigant should first attempt to comply with Convention); Th. Goldschmidt A. G. v. Smith, 676 S. W. 2d 443, 445 (Tex. App. 1984) (Convention procedures not mandatory but are "avenue of first resort"); Pierburg GmbH & Co. KG v. Superior Court, 137 Cal. App. 3d 238, 247, 186 Cal. Rptr. 876, 882-883 (1982) (plaintiffs must attempt to comply with the Convention); Volkswagenwerk Aktiengesellschaft v. Superior Court, 123 Cal. App. 3d 840, 857-859, 176 Cal. Rptr. 874, 885-886 (1981) ("Hague Convention establishes not a fixed rule but rather a minimum measure of international cooperation").
[2] Article 27 of the Convention, see ante, at 538, n. 24, is not to the contrary. The only logical interpretation of this Article is that a state receiving a discovery request may permit less restrictive procedures than those designated in the Convention. The majority finds plausible a reading that authorizes both a requesting and a receiving state to use methods outside the Convention. Ibid. If this were the case, Article 27(c), which allows a state to permit methods of taking evidence that are not provided in the Convention, would make the rest of the Convention wholly superfluous. If a requesting state could dictate the methods for taking evidence in another state, there would be no need for the detailed procedures provided by the Convention.

Moreover, the United States delegation's explanatory report on the Convention describes Article 27 as "designed to preserve existing internal law and practice in a Contracting State which provides broader, more generous and less restrictive rules of international cooperation in the taking of evidence for the benefit of foreign courts and litigants." S. Exec. Doc. A, 92d Cong., 2d Sess., 39 (1972). Article 27 authorizes the use of alternative methods for gathering evidence "if the internal law or practice of the State of execution so permits." Id., at 39-40 (emphasis added).
[3] Our Government's interests themselves are far more complicated than can be represented by the limited parties before a court. The United States is increasingly concerned, for example, with protecting sensitive technology for both economic and military reasons. It may not serve the country's long-term interest to establish precedents that could allow foreign courts to compel production of the records of American corporations.
[4] One of the ways that a pro-forum bias has manifested itself is in United States courts' preoccupation with their own power to issue discovery orders. All too often courts have regarded the Convention as some kind of threat to their jurisdiction and have rejected use of the treaty procedures. See, e. g., In re Anschuetz & Co., GmbH, 754 F. 2d 602, 606, 612 (CA5 1985), cert. pending, No. 85-98. It is well established that a court has the power to impose discovery under the Federal Rules of Civil Procedure when it has personal jurisdiction over the foreign party. Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U. S. 197, 204-206 (1958). But once it is determined that the Convention does not provide the exclusive means for foreign discovery, jurisdictional power is not the issue. The relevant question, instead, becomes whether a court should forgo exercise of the full extent of its power to order discovery. The Convention, which is valid United States law, provides an answer to that question by establishing a strong policy in favor of self-restraint for the purpose of furthering United States interests and minimizing international disputes.

There is also a tendency on the part of courts, perhaps unrecognized, to view a dispute from a local perspective. "[D]omestic courts do not sit as internationally constituted tribunals. . . . The courts of most developed countries follow international law only to the extent it is not overridden by national law. Thus courts inherently find it difficult neutrally to balance competing foreign interests. When there is any doubt, national interests will tend to be favored over foreign interests." Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 235 U. S. App. D. C. 207, 249, 731 F. 2d 909, 951 (1984) (footnotes omitted); see also In re Uranium Antitrust Litigation, 480 F. Supp. 1138, 1148 (ND Ill. 1979).
[5] The Department of State in general does not transmit diplomatic notes from foreign governments to state or federal trial courts. In addition, it adheres to a policy that it does not take positions regarding, or participate in, litigation between private parties, unless required to do so by applicable law. See Oxman, The Choice Between Direct Discovery and Other Means of Obtaining Evidence Abroad: The Impact of the Hague Evidence Convention, 37 U. Miami L. Rev. 733, 748, n. 39 (1983).
[6] See Kerr v. United States District Court, 426 U. S. 394, 402-405 (1976); see also Boreri v. Fiat S. P. A., 763 F. 2d 17, 20 (CA1 1985) (refusing to review on interlocutory appeal District Court order involving extra-territorial discovery).
[7] See, e. g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U. S. 614, 630 (1985); Scherk v. Alberto-Culver Co., 417 U. S. 506, 516-519 (1974); The Bremen v. Zapata Off-Shore Co., 407 U. S. 1, 12-14 (1972).
[8] See, e. g., Romero v. International Terminal Operating Co., 358 U. S. 354, 382-384 (1959); Lauritzen v. Larsen, 345 U. S. 571, 577-582 (1953); Berizzi Bros. Co. v. The Pesaro, 271 U. S. 562, 575 (1926); Wildenhus's Case, 120 U. S. 1, 12 (1887); The Belgenland, 114 U. S. 355, 363-364 (1885); The Scotia, 14 Wall. 170, 187-188 (1872); Brown v. Duchesne, 19 How. 183, 198 (1857); The Schooner Exchange v. McFaddon, 7 Cranch 116, 137 (1812).
[9] See, e. g., First National City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U. S. 611, 626-627 (1983) (presumption that for purposes of sovereign immunity "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such" on the basis of respect for "principles of comity between nations").
[10] Justice Story used the phrase "comity of nations" to "express the true foundation and extent of the obligation of the laws of one nation within the territories of another." § 38. "The true foundation on which the administration of international law must rest is, that the rules which are to govern are those which arise from mutual interest and utility, from a sense of the inconveniences which would result from a contrary doctrine, and from a sort of moral necessity to do justice, in order that justice may be done to us in return." § 35.
[11] Choice-of-law decisions similarly reflect the needs of the system as a whole as well as the concerns of the forums with an interest in the controversy. "Probably the most important function of choice-of-law rules is to make the interstate and international systems work well. Choice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them. In formulating rules of choice of law, a state should have regard for the needs and policies of other states and of the community of states." Restatement (Second) of Conflict of Laws § 6, Comment d, p. 13 (1971).
[12] Chief Justice Marshall articulated the American formulation of this principle in The Schooner Exchange v. McFaddon, 7 Cranch, at 136:

"The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction. . . .
"All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source."
[13] Many of the nations that participated in drafting the Convention regard nonjudicial evidence taking from even a willing witness as a violation of sovereignty. A questionnaire circulated to participating governments prior to the negotiations contained the question, "Is there in your State any legal provision or any official practice, based on concepts of sovereignty or public policy, preventing the taking of voluntary testimony for use in a foreign court without passing through the courts of your State?" Questionnaire on the Taking of Evidence Abroad, with Annexes, Actes et documents 9, 10. Of the 20 replies, 8 Governments  Egypt, France, West Germany, Italy, Luxembourg, Norway, Switzerland, and Turkey  stated that they did have objections to unauthorized evidence taking. Reponses des Governements au Questionnaire sur la reception des depositions a l'etranger, Actes et documents 21-46; see also Oxman, 37 U. Miami L. Rev., at 764, n. 84.
[14] The Federal Republic of Germany, in its diplomatic protests to the United States, has emphasized the constitutional basis of the rights violated by American discovery orders. See, e. g., Diplomatic Note, dated Apr. 8, 1986, from the Embassy of the Federal Republic of Germany. App. A to Brief for Federal Republic of Germany as Amicus Curiae 20a.
[15] See Edwards, Taking of Evidence Abroad in Civil or Commercial Matters, 18 Int'l & Comp. L. Q. 618, 647 (1969). A number of countries that ratified the Convention also expressed fears that the taking of evidence by consuls or commissioners could lead to abuse. Ibid.
[16] According to the French Government, the overwhelming majority of discovery requests by American litigants are "satisfied willingly . . . before consular officials and, occasionally, commissioners, and without the need for involvement by a French court or use of its coercive powers." Brief for Republic of France as Amicus Curiae 24. Once a United States court in which an action is pending issues an order designating a diplomatic or consular official of the United States stationed in Paris to take evidence, oral examination of American parties or witnesses may proceed. If evidence is sought from French nationals or other non-Americans, or if a commissioner has been named pursuant to Article 17 of the Convention, the Civil Division of International Judicial Assistance of the Ministry of Justice must authorize the discovery. The United States Embassy will obtain authorization at no charge or a party may make the request directly to the Civil Division. Authorization is granted routinely and, when necessary, has been obtained within one to two days. Brief, at 25.
[17] For example, after the filing of the initial pleadings in a German court, the judge determines what evidence should be taken and who conducts the taking of evidence at various hearings. See, e. g., Langbein, The German Advantage in Civil Procedure, 52 U. Chi. L. Rev. 823, 826-828 (1985). All these proceedings are part of the "trial," which is not viewed as a separate proceeding distinct from the rest of the suit. Id., at 826.
[18] "In most common law countries, even England, one must often look hard to find the resemblances between pre-trial discovery there and pretrial discovery in the U. S. In England, for example, although document discovery is available, depositions do not exist, interrogatories have strictly limited use, and discovery as to third parties is not generally allowed." S. Seidel, Extraterritorial Discovery in International Litigation 24 (1984).
[19] In France, the Nouveau Code de Procedure Civile, Arts. 736-748 (76th ed. Dalloz 1984), implements the Convention by permitting examination and cross-examination of witnesses by the parties and their attorneys, Art. 740, permitting a foreign judge to attend the proceedings, Art. 741, and authorizing the preparation of a verbatim transcript of the questions and answers at the expense of the requesting authority, Arts. 739, 748. German procedures are described in Shemanski, Obtaining Evidence in the Federal Republic of Germany: The Impact of The Hague Evidence Convention on German-American Judicial Cooperation, 17 Int'l Lawyer 465, 473-474 (1983).
[20] The United States recounts the time and money expended by the SEC in attempting to use the Convention's procedures to secure documents and testimony from third-party witnesses residing in England, France, Italy, and Guernsey to enforce the federal securities laws' insider-trading provisions. See Brief for United States and Securities and Exchange Commission as Amici Curiae 15-18. As the United States admits, however, the experience of a governmental agency bringing an enforcement suit is "atypical" and has little relevance for the use of the Convention in disputes between private parties. In fact, according to the State Department, private plaintiffs "have found resort to the Convention more successful." Id., at 18.

The SEC's attempts to use the Convention have raised questions of first impression, whose resolution in foreign courts has led to delays in particular litigation. For example, in In re Testimony of Constandi Nasser, Trib. Admin. de Paris, 6eme section  2eme chambre, No. 51546/6 (Dec. 17, 1985), the French Ministry of Justice approved expeditiously the SEC's letter of request for testimony of a nonparty witness. The witness then raised a collateral attack, arguing that the SEC's requests were administrative and therefore outside the scope of the Convention, which is limited by its terms to "civil or commercial matters." The Ministry of Justice ruled against the attack and, on review, the French Administrative Court ruled in favor of the French Government and the SEC. By then, however, the SEC was in the process of settling the underlying litigation and did not seek further action on the letter of request. See Reply Brief for Petitioners 17, and nn. 35, 36.
[21] The use of the term "pre-trial" seems likely to have been the product of a lack of communication. According to the United States delegates' report, at a meeting of the Special Commission on the Operation of the Evidence Convention held in 1978, delegates from civil-law countries revealed a "gross misunderstanding" of the meaning of "pre-trial discovery," thinking that it is something used before the institution of a suit to search for evidence that would lead to litigation. Report of the United States Delegation, 17 Int'l Legal Materials 1417, 1421 (1978). This misunderstanding is evidenced by the explanation of a French commentator that the "pretrial discovery" exception was a reinforcement of the rule in Article 1 of the Convention that a letter of request "shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated" and by his comment that the Article 23 exception referred to the collection of evidence in advance of litigation. Gouguenheim, Convention sur l'obtention des preuves a l'etranger en matiere civile et commerciale, 96 Journal du Droit International 315, 319 (1969).
[22] France has recently modified its declaration as follows:

"The declaration made by the Republic of France pursuant to Article 23 relating to letters of request whose purpose is `pre-trial discovery of documents' does not apply so long as the requested documents are limitatively enumerated in the letter of request and have a direct and clear nexus with the subject matter of the litigation."
"La declaration faite par la Republique francaise conformement a l'article 23 relatif aux commissions rogatoires qui ont pour objet la procedure de `pre-trial discovery of documents' ne s'applique pas lorsque les documents demandes sont limitativement enumeres dans la commission rogatoire et ont un lien direct et precis avec l'objet du litige." Letter from J. B. Raimond, Minister of Foreign Affairs, France, to H. H. van den Broek, Minister of Foreign Affairs, The Netherlands (Dec. 24, 1986).
The Danish declaration is more typical:
"The declaration made by the Kingdom of Denmark in accordance with article 23 concerning `Letters of Request issued for the purpose of obtaining pre-trial discovery of documents' shall apply to any Letter of Request which requires a person:
"a) to state what documents relevant to the proceedings to which the Letter of Request relates are, or have been, in his possession, other than particular documents specified in the Letter of Request;
"or
"b) to produce any documents other than particular documents which are specified in the Letter of Request, and which are likely to be in his possession." Declaration of July 23, 1980, 7 Martindale-Hubbell Law Directory (pt. VII) 15 (1986).
The Federal Republic of Germany, Italy, Luxembourg, and Portugal continue to have unqualified Article 23 declarations, id., at 16-18, but the German Government has drafted new regulations that would "permit pretrial production of specified and relevant documents in response to letters of request." Brief for Anschuetz & Co. GmbH and Messerschmitt-Boelkow-Blohm GmbH as Amici Curiae 21.
[23] An Article 23 reservation and, in fact, the Convention in general require an American court to give closer scrutiny to the evidence requested than is normal in United States discovery, but this is not inconsistent with recent amendments to the Federal Rules of Civil Procedure that provide for a more active role on the part of the trial judge as a means of limiting discovery abuse. See Fed. Rule Civ. Proc. 26(b), (f), and (g) and accompanying Advisory Committee Notes.