## In re AIRCRASH DISASTER NEAR ROSELAWN, INDIANA OCTOBER 31, 1994.

MDL–1070.
No. 95C 4593.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 19, 1997.

---

Michael Connelly, Connelly & Schroeder, Chicago, IL, for Plaintiffs.

Kevin Durkin, Clifford Law Offices, Chicago, IL, for Defendants.

### ORDER

BOBRICK, United States Magistrate Judge.

Before the court is PLAINTIFFS' MOTION TO COMPEL.[1] This case arises out of an aircraft crash disaster involving an aircraft known as "ATR–72" which was designed and manufactured in France, and marketed and sold in the United States by defendant, third-party defendant, and counter-claimant Avions de Transport Regional, G.I.E., and defendants Aerospatiale Societe National Industrielle, S.A., ("foreign aircraft defendants"), ATR Support, Inc., ATR Marketing, Inc., and Aerospatiale, Inc., collectively referred to as "aircraft defendants." The particular ATR–72 aircraft that was involved in the crash disaster was purchased, leased or owned, operated, and flown as a commercial passenger carrying aircraft by defendants Simmons Airlines, Inc., American Airlines, Inc., AMR Corporation, AMR Eagle, Inc., and AMR Leasing Corporation, collectively referred to as "airline defendants."[2]

Plaintiffs' motion, while directed to all defendants, seeks responses to its FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND TANGIBLE ITEMS TO ALL DEFENDANTS primarily from the aircraft defendants.[3]

In their first set of requests, plaintiffs sought categories of documents and information concerning the subject aircraft model ATR–72 and aircraft model ATR–42. The aircraft defendants did not object to providing documents or information concerning the ATR–72, and substantially did so; the aircraft defendants did, however, object to providing any information or documentation concerning the ATR–42.[4]

The ATR–42's design, manufacture, and/or operation by defendants preceded the ATR–72. Plaintiffs characterize the ATR–72 as nothing more than a "stretch version" of the ATR–42 aircraft and, as such, maintain that information including certification tests, wing deicing deficiencies, and icing related acci-

---

1. The plaintiffs proceed with discovery through a court ordered and approved discovery committee who's function and purpose is to coordinate liability discovery on behalf of all plaintiffs in this multi-district litigation.

2. In all future memorandum orders, this court will refer to defendants in the collective terms, "aircraft defendants" and "airline defendants."

3. We suspect the airline defendants are equally interested in access to the requested documents as the plaintiffs.

4. Plaintiffs, in their motion to compel, seek information and documents under their requests for production concerning the following: certification test for the ATR–42—Request Nos. 4, 25, 26, 27, 28, 29, 37, 38, 41, 42, 43, 48, 49, 50, 51, and 58; previous accidents or incidents of the ATR-

42 involving icing—Request Nos. 6, 7, 40, 44, 45, 46, 47, 52, 62, 69, and 73; icing tests and results conducted on the ATR–42 in 1988 at Boscombe Down, England—Request Nos. 59, 70, 71 and 72; wing profile information of the ATR–42—Request No. 60; substantiating data for placement of vortex generators on the ATR–42—Request No. 61; ATR operator's meeting held March and April, 1987 concerning flight control of the ATR–42—Request Nos. 63 and 64; information relating to a crash of ATR–42 in northern Italy—Request Nos. 62 and 69; reliability of wing boots of the ATR–42—Request No. 68; meeting between ATR and United States' officials held on or about December 22, 1986 regarding icing incidents involving the ATR–42—Request Nos. 53 and 54.

dent information concerning the ATR 42 is highly relevant and material to issues of liability. The aircraft defendants argue that "[t]he ATR–42 and ATR–72 model aircrafts are two different and distinct aircrafts which underwent separate and distinct certification programs" and, consequently, the requested documents on the ATR–42 "are wholly unrelated to the Roselawn accident." (Aircraft Defendants' Response to Request No. 47). The aircraft defendants also maintain that plaintiffs' discovery is unduly burdensome and harassing. Additionally, the foreign aircraft defendants argue that they are not subject to discovery under the Federal Rules of Civil Procedure in any event, since discovery as to them must proceed exclusively under the Hague Convention.

## I. BACKGROUND

While flying in icing conditions, on October 31, 1994, an aircraft model ATR–72, designed and manufactured by the aircraft defendants, operated and flown by the airline defendants, suddenly experienced a catastrophic loss of control, entering into an uncorrectable roll that caused the plane to crash. The site of the crash was near Roselawn, Indiana. All 68 persons aboard the plane perished in the tragedy. The National Safety Transportation Board ("NSTB") immediately conducted an investigation into the crash. On July 9, 1996, the NSTB issued its Aircraft Accident Report[5] ("NSTB Report") in which it found as probable cause of the ATR–72 crash:

"... the loss of control, attributed to a sudden and unexpected aileron hinge moment reversal that occurred after a ridge of ice accreted beyond the deice boots because: 1) ATR failed to completely disclose to operators and incorporate in the ATR–72 airplane flight manual, flightcrew operating manual and flightcrew training programs, adequate information concerning previously known effects of freezing precipitation on the stability and control characteristics, autopilot and related operational procedures when the ATR–72 was operated in such conditions; 2) the French Directorate General for Civil Aviation's in-

adequate oversight of the ATR 42 and 72, and its failure to take the necessary corrective action to ensure continued airworthiness in icing conditions; and 3) the French Directorate General for Civil Aviation's failure to provide the Federal Aviation Agency's with timely airworthiness information developed from previous ATR incidents and accidents in icing conditions, as specified under the Bilateral Airworthiness Agreement and Annex 8 of the International Civil Aviation Organization.

Contributing to the accident were: ... 2) the Federal Aviation Agency's inadequate oversight of the ATR 42 and 72 to ensure continued airworthiness in icing conditions."

(NSTB Report, p. vii).

### A. Certification History of the ATR–42 and 72

The ATR–42 was first certified by the France airworthiness authority, the Direction Generale De L'Aviation Civile ("DGAC") in September, 1985. On October 23, 1985, the Federal Aviation Administration ("FAA") granted Type Certificate A53EU for the ATR–42. The Certificate demonstrates that the aircraft design met the federal aviation airworthiness requirements of Part 25 of the Federal Aviation Regulations.

Sometime in the mid–1980's, the aircraft defendants began developing a larger—that is to say, longer—version of the ATR–42, to be called the ATR–72. The aircraft defendants' project engineer for the ATR–72, Mr. J. Rech, in making application to the FAA for a U.S. Type Certificate for the aircraft, described the ATR–72 as a "stretched version of the ATR–42" and that "the only significant new feature introduced in this model consists of the choice of carbon material for the outer part of the wing." (Motion to Compel, Ex. 2). The DGAC, in writing the FAA on behalf of the aircraft defendants for certification of the ATR–72, stated "ATR–72 airplane is considered by DGAC for French type certification as a derivative of the ATR–42 airplane. The airworthiness requirements ... will be based on requirements notified

5. The Report is comprised of two volumes: Volume I contains the Safety Board Report Volume II contains the Response of Bureau Enquetes—Accidents to Safety Board's Draft Report.

for ATR–42 …" (Motion to Compel, Ex. 6). The aircraft defendants did not apply for a new type certification for the ATR–72.

Since the ATR–72 was a stretched version of the ATR–42, and thus a heavier airplane, it required a larger wing surface to accommodate the greater wing loading factors. Accordingly, wing extensions were designed for the ATR–72 from the ATR–42 basic wing design and configuration. The FAA's sole aircraft test for the ATR–72 certification, then, was structural testing of the extension of the wings. (Motion to Compel, Ex. 5).

On November 8, 1989, the FAA accepted the aircraft defendants' application for inclusion of the ATR–72 in the ATR–42 Type Certificate No. A53EU stating:

> "The Model ATR–72 is a growth version of the ATR–42 and incorporates a 14–foot 9–inch fuselage extension, 9–foot, 2–inch wing span extension with outboard wing sections incorporating composite material, new Pratt and Whitney PW124 engines with electronic fuel control systems and maximum take-off weight increased to 44–070 pounds or an optional 47–400 pounds. Maximum take-off weight for any ATR–42 series airplane is 36,825 pounds. The design also incorporates multi-function computers which are essential to safety of flight. These changes are not considered so extensive as to require a new application for TC under the provisions of Section 21.19."

The FAA, in its acceptance of the certification application for the ATR–72, noted no significant changes between the ATR–42 and ATR–72 in basic wing design, lateral control surfaces (ailerons) and mechanisms, deicing equipment, and procedures for flight in icing conditions.

On November 15, 1989, the FAA, pursuant to the aircraft defendants' application, amended Type Certificate A53EU issued for the ATR–42, allowing for inclusion of the ATR–72 within the Certificate. Under the Federal Aviation Regulations (Section 2197), in instances where there is significant change in a type design, the aircraft manufacturers must "submit substantiating data and necessary descriptive data for inclusion in the type design." No such information was submitted to the FAA by the aircraft defendants on the ATR–72.

### B. Characteristics Common to ATR–42 and 72 Aircraft

The airline defendants who operate the ATR–42 and ATR–72 specifically describe similarities and differences between the ATR–72 and ATR–42 as follows:

> "The ATR 72 aircraft is a larger version of the ATR 42. Standard passenger seating in the ATR 72 consists of 64 seats. When compared to the ATR 42, the design of the various systems and crew operating procedures are minimal. The major differences involve the power plants (PW124B, PW 127 in –210 aircraft) and the Multi–Function Computers (MFC)."

(Motion to Compel, Ex. 9; ATR 42/72 Operating Manual).

The investigation and reporting by the NSTB into the instant crash disaster describe aircraft control deficiencies of the ATR–72 and ATR–42 while operating in icing conditions. Accordingly, our discussion of the relevant similarities of the ATR–42 and ATR–72 aircraft will necessarily concern only those aircraft control components and characteristics pertinent, and most identified in the NSTB Report as having a relationship, to the crash, namely: wings, deicing equipment, lateral flight control system, and aircraft flight operating procedures in icing conditions.[6]

### 1. Wing

The ATR–42 and ATR–72 aircrafts share identical airfoil (wing) design, namely NACA 43 "5 digit series non-laminar design" and, as

---

6. Our discussion of the more relevant common features of the subject aircraft also follows the aircraft defendants' own identification of relevant components:

> "information relevant to this issue confirms that the components, systems, and performance characteristics of the ATR–42 versus

those of the ATR–72 aircraft which is in issue in these cases—the de-icing systems, the outer wings and certain control surfaces, and icing aerodynamics characteristics—are substantially and materially different." (Defendants' Opposition to Motion to Compel, p. 2).

such, the two aircraft have the same percentage cord to the wing, and effectively show the same pressure distribution upon the wing. While the ATR–72 wing has extensions to accommodate increased wing loading due to the heavier nature of the plane, the aerodynamics of the ATR–42/72 wing as an airfoil are, nonetheless, essentially the same. In this regard, the aircraft defendants, themselves, believed there existed significant similarities in the wing of the ATR–72 to that of the ATR–42; during the aircraft type certification process they submitted ATR–42 wing limit load data to substantiate the same data for the ATR–72. (Motion to Compel, Ex. 5).

The aircraft defendants, in seeking certification of the ATR–72. relied upon ATR–42's full scale static specimen testing as a valid structural analysis of the ATR–72 wing. Testing of the ATR–72 wing was to be limited to the outer wing extensions. The FAA recorded the aircraft defendants' representations and proposals as follows:

" . . . As far as the fuselage and the wing center box are concerned, owing to the large similarity in both the design and working stress levels between the ATR–72 and ATR–42 components, ATR considers the validity of the structural analysis to have been validated by the static testing at limit load performed on the ATR–42 full scale static specimen. They do not intend, therefore, to repeat the same test for the ATR–72 aircraft and ask for FAA concurrence with a substantiation by analysis. . . . *FAA Response to ATR Position:* The FAA concurs with the ATR position regarding the use of analysis (based on ATR–42 test results), to substantiate the limit loads for the data for the ATR–72 fuselage and wing center box . . . "

(Motion to Compel, Ex. 5, pp. 2, 5).

The outer wing composite structure of the ATR–72 represents the only significant difference between the wings of the two aircraft. ATR's chief engineer, André Bord [7], described the differences of ATR–42 and ATR–72 wings as follows: "The basic difference is . . . capacity . . . the wing design which is very similar, you have exactly the

same—section wing" (Plaintiff's Reply, Bord Testimony p. 893). Captain Robert Briot, ATR's chief engineering test pilot, who was involved in the development of the ATR–42 and ATR–72 from the inception of their design, described the ATR–72 wing's similarities to that of the ATR–42 as follows: "the inner-wing. is the same and the outer wing has been increased to accommodate a wing loading which is slightly larger than ATR–42 but it stays in the same range as the other turboprop" (ATR–42), "they have the same airfoil," with "very similar" handling characteristics, stall characteristics, and angles of attack. (Plaintiff's Reply, Transcript of Captain Robert Briot, pp. 1132–33, 1200–01).

### 2. Ice and Rain Protection System

According to the aircraft defendants, the ATR–42 and 72 share virtually an identical ice protection system (videotape entitled "ATR Ice Protection System—ATR Exhibit IC 1—viewed *in camera* by the court ). The NSTB, in its report, described the system shared by the ATR–42 and ATR–72 as follows:

The ATR–42 and 72 ice protection system is a combination of deicing and anti-icing systems. This system—for .both aircraft—consists of the following:

1. a pneumatic system (leading edge inflatable boots) that permits deicing of critical airframe surfaces, i.e., outboard and inboard wing sections, the horizontal stabilizer leading edges, and the vertical stabilizer (optional); . . .

2. a pneumatic system for deicing the engine air intakes;

3. electrical heating for anti-icing of the propeller blades, the windshield and forward portion of the side windows, the pitot tubes, static ports, TAT [total air temperature] probe, and the AOA vanes;

4. electrical heating for anti-icing of the aileron, elevator and rudder balance horns;

5. and a windshield wiping system for the forward windows.

---

7. The aircraft defendants have described statements of Mr. Bord concerning the design of the

ATR–42 and ATR–72 as "the only competent evidence before the court."

The ice protection systems of the ATR–42 and ATR–72 are controlled and monitored from control panels located in the cockpit. Additionally, both planes have an Anti–Icing Advisory System (AAS) which provides the flight area with a visual and aural alert when ice begins to accrete. There is virtually no difference between ATR–42 and ATR–72 de-icing equipment. (NSTB Report, pp. 25–26).

### 3. Lateral flight control system

Development of the ATR–42 and ATR–72 lateral control systems share a common history and design. (NSTB Report, pp. 74–75). The aircraft defendants' current chief engineer, André Bord, described the similarities of the lateral control components of the ATR–72 and 42 as follows: "... the spoiler/aileron combination ... adapted to specific conditions are exactly from the same concept" (Plaintiff's Reply—Bord Testimony, Tr. 893; see also detailed Bord description of the common ATR–42/72 Lateral Control System, pp. 899–944). While the ailerons on the ATR–72 are slightly larger than those on the ATR–42, the lateral flight control system of the planes is virtually identical, having movable, unpowered ailerons plus hydraulically-actuated wing spoilers that supplement the aileron. (NSTB Report, pp. 18–21; Aircraft Defendant's Brief in Opposition, Ex. B, Declaration of André Bord, pp. 8–9). The aileron system used on the ATR–42 and ATR–72 was determined to be susceptible to undesirable aileron hinge moment changes (including asymmetric hinge moment reversals) and subsequent uncommanded aileron deflections during some airflow separation conditions. (NSTB Report, p. 21). The NSTB noted "ATR had experienced aileron hinge moment reversals during the development of both the ATR–42 and 72." (NSTB Report, pp. 176–181).

### 4. Flight Operating Procedures in Icing Conditions

The ATR–42 and 72 share the same Flight Operating Manuals. (Motion to Compel, Ex. 6). Moreover, the ATR 42 and 72 manuals for operating in winter or icing conditions are substantially identical (Id.; NSTB Report, pp. 109–113). In December, 1992, the aircraft defendants published a brochure entitled *"All Weather Operations"* which was distributed to ATR operators. The publication did not draw any distinctions or differences between ATR–42 and 72 aircraft operations in various weather conditions, including icing. This brochure also contained a section dedicated to "freezing rain," which provided, in part, "Although freezing rain is not part of certification cases, it must be taken into account for operations in icing conditions." The brochure described, among other things, the following aircraft icing characteristics and operating procedures for ATR–42/72 aircraft:

(1) the potential for ice accretion aft of the leading edges of airframe components;

(2) the potential for asymmetric wing lift and "associated increased aileron forces necessary to maintain coordinated flight before aerodynamic stall;"

(3) operating procedures for freezing rain encounters (monitor for autopilot for roll retrim messages, increase speed as much as possible, extend flaps as close as possible to VFE [design flap limiting speed], avoid excessive maneuvering);

(4) procedures to follow in the event of a roll axis "anomaly:" "disconnect AP holding control stick **firmly**. Possible abnormal rolls will be better felt when piloting manually."

(NSTB Report, pp. 84–85, Appendix I). The brochure did not, however, report aileron hinge moment behavior and the associated autopilot behavior of the ATR–42 in freezing rain conditions, though this information was specifically known to the aircraft defendants, nor was this known information incorporated into the ATR–42/72 airplane flight manuals. (NSTB Report, p. 88).

### C. *Previous ATR 42/72 incidents and accidents*

The ATR–42 and ATR–72 share a history of sudden and profound loss of aircraft flight control when operating in icing conditions. (Motion to Compel. Exs. 12, 13). The instant ATR–72 aircraft disaster. which occurred in icing conditions, was attributed to a build up of a ridge of ice beyond the deicing

boots located on the leading edge of the wings, causing a sudden and unexpected aileron hinge moment reversal[8] that put the aircraft in an uncontrollable roll. (NSTB Report, p. 210). In September, 1989, the FAA noted approximately six incidents, including one serious accident, wherein the ATR–42 exhibited unacceptable flight characteristics when operating in icing conditions. (Motion to Compel, Ex. 12). The NSTB, in its report on the Roselawn ATR–72 crash, found relevant to its determination of probable cause five ATR–42 incidents or accidents involving recurring airworthiness problems in icing conditions and resultant aileron hinge moment reversals. (NSTB Report pp. 75–88, 176–180).

The Bureau Enquestes—Accidents (France) ("BEA")—apparently France's corresponding governmental agency to the NSTB—in response to the NSTB Report in which it disagreed with the NSTB's analysis and conclusions on probable cause of the subject ATR–72 crash, stated:

> "The NSTB report omits significant factual information regarding prior ATR 42 incidents as well as the extensive post–Roselawn accident investigation. This information is critical to a complete understanding of this accident ..." (Aircraft Defendant's Opposition to Motion to Compel, Ex. M; NSTB Report, Vol. II. p. 101).

The incidents or accidents that occurred in freezing drizzle/rain conditions, and involved varying degrees of uncommanded aileron deflections with subsequent uncontrolled roll excursions, were investigated by either the NSTB, BEA, or the aircraft defendants. The NSTB noted significant similarities between some of the prior roll control incidents and the ATR–72 Roselawn crash disaster. (NSTB Report, pp. 75–88, Appendix H). According to plaintiffs, an aircrash of an ATR–42 occurred in northern Italy, the circumstances of which bore a striking resemblance to the Roselawn Crash. The aircraft defen-

dants were involved in the investigation of that crash. (Motion to Compel at 13).

In September, 1989, the FAA became concerned about unacceptable flight characteristics of the ATR–42 airplane and its continued safe flight in icing conditions. This information was conveyed to DGAC and the aircraft defendants. The FAA requested the aircraft defendants to "provide data to show that the problems experienced with the ATR–42 will not be present on the ATR–72, which is a derivative model" (Motion to Compel, Ex. 12). The Roselawn aircrash occurred on October 21, 1994. On November 18, 1994, the FAA issued a Flight Standard Information Bulletin establishing operating restrictions and procedures for the ATR–42 and 72 aircraft. The procedures related to avoidance of adverse effects of in-flight ice accumulation, and were identical for the two aircraft. This bulletin was issued as a result of the instant ATR–72 aircrash. (Motion to Compel, Ex. 8).

## II. *DISCUSSION*

### A. *Aircraft Defendants' Position*

This matter arises from the aircraft defendants' objections to that part of PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND TANGIBLE ITEMS TO ALL DEFENDANTS which seeks production of a wide range of documents and information relating to the ATR–42 aircraft. The aircraft defendants' threshold argument in support of their refusal to produce the documents plaintiffs seek is that the ATR–42 is, as a matter of fact, a "substantially and materially" different aircraft than the ATR–72 and, as such, the requested documentation is not "even marginally relevant here." (Aircraft Defendants' Opposition to Motion to Compel, at 2). The aircraft defendants impose other, general objections to the requests as well. Lastly, the aircraft defendants argue that plaintiffs' requests are

---

**8.** Aileron hinge moment reversal is described to occur when ice accumulates aft of the deicing boots on the top of the wings causing the wing to cease to be an effective airfoil and it stalls out. This phenomenon can be aggravated by the vacuum-like condition (low pressure area) which exists when the wind travels across the wing sur-

faces, and loses its continuity with the wing. At this point, the autopilot shuts off. The residual "vacuum" snatches or deflects the aileron upward "(hinge moment reversal)." At this point the wing plunges downward and the airplane goes into a violent and dramatic roll. (See NSTB Report, pp. 93–94).

deficient for "their failure to comply with the Supreme Court's directives concerning the Hague Convention on Taking Evidence Abroad in Civil and Commercial Matters."

The aircraft defendants support their threshold argument of lack of relevance with the Declaration of Mr. André Bord, which they characterize as "the only reliable and verified information relevant to this issue ... that the components, systems, and performance characteristics of the ATR–42 versus those of the ATR–72 ... are substantially and materially different." (Defendant's Opposition to Motion to Compel, p. 2). Aircraft defendants argue that they should not be ordered to produce the requested documents since plaintiffs have fallen short of the Fed. R.Civ.P. 26 requirements that the requesting party make "a threshold showing of relevance before the opposing party is obligated to open discovery of designs not 'directly in issue' in the litigation."[9] (Defendant's Opposition to Motion to Compel, p. 1). In support of their argument defendants cite to *Hofer v. Mack Trucks, Inc.,* 981 F.2d 377, 380 (8th Cir.1992), and *Fine v. Facet Aerospace Prod. Co.,* 133 F.R.D. 439, 443 (S.D.N.Y.1990). It is within this framework that the aircraft defendants argue that André Bord's Declaration trumps any possible claim plaintiffs might have which could show necessary relevance as a prerequisite for discovery of any of the documents pertaining to the ATR–42.[10] As such, the aircraft defendants urge that plaintiffs' motion to compel be denied.

## B. *Relevancy Issues*

Document requests under Rule 34 of the Federal Rules of Civil Procedure are governed by the liberal standard set forth in Rule 26(b)(1), which permits discovery "regarding any matter not privileged, which is relevant to the subject matter involved in the pending action." The test of what is relevant is best left to a common sense approach by the court. 8 Charles Alan Wright, Richard L. Marcus, Federal Practices and Procedure:

Civil 2d, § 2008. Even information that is not admissible at trial may be sought as long as the information sought to be discovered "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.; Amcast Industrial Corp. v. Detrex Corp.,* 138 F.R.D. 115, 118 (N.D.Ind.1991); *See also Sullivan v. Conway,* 1995 WL 573421 at 1 (N.D.Ill.1995) 1995 U.S.Dist. Lexis 14113 at 2. The phrase, "relevant to the subject matter involved in the pending action" is broadly construed to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case, without limitation to the issues raised by the pleadings. Relevancy cannot be equated with admissibility at trial or the narrow issues presented by the facts. The test of relevancy is the subject matter of the action. *McClain v. Mack Trucks, Inc.,* 85 F.R.D. 53, 61 (E.D.Pa.1979). Relevancy, then, is broadly construed at the discovery stage of the litigation, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action. *Smith v. MCI Telecommunications Corp.,* 137 F.R.D. 25, 27 (D.Kan.1991). Discovery is designed to help define and clarify the issues, and is not limited to the merits of a case, since a variety of fact-oriented issues may arise during litigation that are not related to the merits. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978); *U.S. v. Electro–Voice, Inc.,* 879 F.Supp. 919, 922 (N.D.Ind.1995). We conclude that subject matter relevancy in this case appropriately deals with, among other things, the design, design history, certification, flight components, and operational history of the ATR–72, and any similar product showing similar flight problems.

The plaintiffs argue that the requested documents relating to the design, operation, and flight experience of the ATR–42 model,

---

9. While we do not agree with the aircraft defendants articulated reading of Fed.R.Civ.P. 26, we need not address that issue since the matter can be disposed of on a more substantive basis.

10. The aircraft defendants, in their brief in opposition state "the court is respectfully urged to read and thoroughly consider Mr. Bord's full declaration in connection with the disposition of the present motion as it contains the most central information available regarding the issues *sub judice.*" (Aircraft Defendants' Opposition to Motion to Compel, p. 5).

as well as records of prior crashes and control loss incidents, are relevant to both product liability claims and negligence claims. Additionally, plaintiffs argue that sufficient evidence exists to show a relevant nexus between the flight control problems of the ATR–42 and the crash of the ATR–72 at Roselawn, Indiana.

Issues of liability, to be brought before a factfinder in this case, will deal with, among other things, design, certification, operation, and development of the ATR–72. We find the record in this matter sufficient, at a minimum, to establish a close and compelling link, if not an inextricable connection between the design and airworthiness of the ATR–72 to that of the ATR–42. Simply put, the ATR–42 appears to be a fundamental part of the ATR–72 design history. Further, the record is replete with evidence that the ATR–42 and ATR–72 are not "two different and distinct aircraft." We find ample evidence exists in this case to support plaintiffs' position that the design, certification, operation and flight experiences of the ATR–42, are relevant to issues of liability relating to the crash of the subject ATR–72 and, as such, discovery is appropriate, as more fully described below.

### 1. Findings of Investigative Agencies

The NSTB found that both the DGAC's and FAA's inadequate oversight of the ATR–42 airworthiness in icing conditions was part of the cause of the ATR–72 crash involved in the instant case. (Supra, at 298). This is sufficient reason, on its own, to find necessary relevance to allow broad discovery into the ATR–42 design, certification, and flight characteristics. Prior ATR–42 incidents involving unacceptable flight characteristics while operating in icing conditions have been found by the NSTB to be relevant in the instant crash. (Supra, at 301–02). Even before the crash of the ATR–72 at Roselawn, the aircraft defendants were admonished by the FAA "to show that problems experienced with the ATR–42 will not be present in the ATR–72." (Supra, at 302). Additionally, the BEA, found that factual information regarding prior ATR–42 aircraft was critical to a complete understanding of the instant ATR–72 accident. (Supra, at 302). These four U.S. and French governmental agencies, representing, in this matter, the dominant governmental bodies involved in either aircraft crash analysis or aviation oversight and regulation, have articulated a synergistic relationship between the ATR–42 and ATR–72, which includes their common control problems when operating in icing conditions. This also shows a sound basis for allowing inquiry into all design and operational aspects of the ATR–42.

### 2. Certification

The aircraft defendants have submitted the post-discovery declaration of André Bord for the purposes of demonstrating that the ATR–42 and 72 are two separate and distinct aircraft. We find Mr. Bord's Declaration, when viewed against the actual record in this case, to be unworthy in establishing any support for the aircraft defendants' extended arguments and conclusions.[11]

Defendants claim that the ATR–42 and ATR–72 "have different certification bases." The record belies such claim. When the ATR–72 aircraft was submitted for certifica-

---

11. We find little value to Mr. Bord's Declaration in resolving the discovery issues in this case, other than it being a re-confirmation of the existence of contested factual issues concerning the similarity of design, certification, operations and crash experience between the ATR–42 and 72 aircraft—all of which then, in the first instance, justifies discovery aimed at the ATR–42 as the predecessor of the ATR–72 aircraft. We perceive that the basis of many of Bord's technical assertions, set forth in his Declaration, are based upon references to documents that are the very subject of the First Request for Production of Document; to name a few there is the ATR Wing Plan Form, ATR Wing Width, ATR–42–300 Wing Vortex Generators, ATR–42–300 Flap System, ATR–72–210 Flap System, ATR's All Weather Operations, and ATR Icing Conditions Procedure. Most noteworthy about Mr. Bord's assertions in his Declaration is the many contradictions of earlier statements made by him under oath (see supra, pp. 300, 301). Additionally, his declarations about the lack of similarities to the aircrafts are at odds with earlier statements of high ranking technical officials within the aircraft defendants' organization, i.e., Mr. Rech and Mr. Briot (supra, pp. 298, 300). Bord's assertion concerning the lack of relevancy of earlier crashes of the ATR–42 to the Roselawn ATR–72 crash is at complete odds with his government's view, (supra, p. 301) the FAA, and the findings of the NSTB Report (supra, pp. 298, 301–02).

tion to the FAA, the aircraft defendants, through their chief engineer, characterized the ATR–72 aircraft as a "stretched version of the ATR–42" with no new significant feature other than the choice of "carbon materials for the outer part of the wing." (supra, at 298). The DGAC, on behalf of the aircraft defendants, characterized the ATR as "a derivative of the ATR–42." (supra, at 298). The FAA concluded, that the changes in the ATR–72 from the original design of the ATR–42 were not extensive and. consequently, the ATR–72 would not need new certification, but would be added to the ATR–42 certification. (supra, at 299). Where sufficient similarities exist and a predecessor model shares pertinent characteristics with the model at issue in the case, full discovery is appropriate. *Hofer,* 981 F.2d at 381. The common certification shared by the two aircrafts is strong evidence of similarity of design, thus supporting discovery of both aircraft. There is more to this record, however, than the common Type Certification shared by the two aircraft.

### 3. Component similarities

The ATR–42 and ATR–72 share relevant component similarities, and as such all design, testing, certification and operational information would be clearly discoverable. *Id.* These similarities involve the aircrafts' wings, lateral control system, de-icing equipment, and flight operating procedure in icing conditions. All these components were found important in the investigation and integral to the probable cause determination for the ATR–72 crash. The aircraft defendants themselves found these same component, system and performance characteristics relevant. (n. 6, supra).

First, and perhaps most relevant in this case, is the aileron hinge moment reversals experienced during development of the two aircraft. (supra, at 301). The ATR–42 and ATR–72 share an identical spoiler/aileron combination and are subject to the same undesirable aileron hinge moment change. *Id.* This fact was even attested to by Mr. Bord. (Plaintiff's Reply Brief—Bord Testimony Tr. 893, 899–994). The wings of the ATR–42 and ATR–72 structure are substantially the same in design, with very similar

handling characteristics, stall characteristics, cords, and angles of attack. (supra, at 299–300). The only difference between the wings of the two planes is the extension of the outer wing of the ATR–72 to accommodate the extra loading of its stretched body. *Id.* The Aircraft Ice and Rain Protection System is virtually identical on the ATR–42 and 72. (supra, p. 300). Finally, flight operating procedures in icing conditions are identical to the ATR–42 and 72 aircrafts. (supra, pp. 301–02).

### 4. State of record showing subject matter relevance

The aircraft defendants argue that Bord's Declaration requires plaintiffs to file an "affidavit of an expert in aviation engineering" in order to make a "threshold showing of relevance by competent evidence." They further argue that, in the absence of such affidavits, the plaintiffs must loose the issue. We find difficulty with this proposition. We look to the state of the record as a whole to determine issues of relevancy, this would include, among other things, the little-regarded Declaration of Mr. Bord (see n. 11, supra). But the record in this case is more than Mr. Bord's Declaration. No less than four United States and French governmental agencies, involved in aviation matters, have identified significant similarities in the design, performance, and operating experience of the ATR–42 and ATR–72 aircraft. The reports of the various governmental aviation agencies, together with the representation of the aircraft defendants themselves on the similarities of the two aircraft, account for more than a threshold showing of relevance to allow for full discovery of all matters involving the ATR–42.

We find this record replete with reliable evidence showing substantial similarities in the design of the ATR–72 and its predecessor the ATR–42. This alone is sufficient to find discovery concerning the ATR–42, as initiated by plaintiffs, justified on the basis of subject matter relevance. *Fine v. Facet Aerospace Products,* 133 F.R.D. 439, 442–443 (S.D.N.Y.1990). But here we even have plaintiffs raising, among other things, a design defect which entitles broader discovery,

*Fine,* 133 F.R.D. at 442, citing *Murphy v. Nissan Motor Corp. in U.S.A.,* 650 F.Supp. 922, 925 (E.D.N.Y.1987). At a minimum, the record shows that such discovery is reasonably calculated to lead to the discovery of admissible evidence. *Audiotext Communications Network v. U.S. Telecom, Inc.,* 1995 WL 625962 at 3. (D.Kan.1995); *Josephs v. Harris Corporation,* 677 F.2d 985, 991 (3rd Cir.1982); *Bowman v. General Motors Corp.,* 64 F.R.D. 62 (E.D.Pa.1974); *Kramer v. Boeing,* 126 F.R.D. 690, 693–694 (D.Minn.1989).

### 5. History of ATR–42 Accidents and Incidents Relevant to ATR–72

Adding to the equation of subject matter relevancy, which included the similarity of design of the aircraft, is the common history of flight control loss. The FAA, NSTB, and the BEA have found a history of accidents and incidents, involving uncontrolled roll excursions of the ATR–42 while operating in icing conditions, that they believed material and relevant to the cause of the ATR–72 crash (supra, pp. 298, 301–02). These ATR–42 accidents or incidents involve uncontrollable roll excursions due to unexpected aileron hinge moment reversal. This phenomenon experienced in the ATR–42 presents an identical, if not substantially similar, situation to that involved with the ATR–72 Roselawn crash. (NSTB Report, pp. 75–88).

We know that evidence of other accidents involving similar products is relevant in products liability cases to show notice to defendants of the danger and cause of the accident. Here we find the accident and incident history of the ATR–42—predecessor model to the ATR–72, a model described as a "stretched version" of the ATR–42—to be a sufficient basis to allow full discovery. Indeed, it is a sufficient basis even for evidentiary purposes. *Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261, 1268 (7th Cir. 1988) (cited by the defendants).

### 6. Finding of ATR–42 subject matter relevance

Common sense reasoning finds the significant similarities of the ATR–42 and ATR–72 enough to establish subject matter relevancy supporting comprehensive discovery into the crashed aircraft's predecessor, the ATR–42.

The record in this case shows several close and fundamental connections between the ATR–42 and ATR–72, not the least of which are: (1) the aircraft defendants' own characterization that the ATR–72 is no more than a "stretched version of the ATR–42;" (2) the FAA certification procedure that allowed the aircraft defendants to include the ATR–72 in the ATR–42 certification, without having to go through a distinct and separate certification process; (3) the FAA admonition to the aircraft defendants, prior to the Roselawn crash, to show that the ATR–42 control problems were not present in the ATR–72; and (4) the airline defendants' own objective evaluation and assessment, as an operator of a fleet of ATR aircraft, of the homogeneity of the ATR–42 and 72 aircraft to wit:

> "The ATR 72 aircraft is a larger version of the ATR 42. Standard passenger seating in the ATR 72 consists of 64 seats. When compared to the ATR 42, the design of the various systems and crew operating procedures are minimal. The major differences involve the power plants (PW124B, PW 127 in –210 aircraft) and the Multi-Function Computers (MFC)."

(Motion to Compel. Ex. 9, ATR 42/72 Operating Manual).

If there is in this case a legitimate controversy concerning plaintiffs' obligation to make a "threshold showing of relevance" before they could initiate discovery, we find the state of the record such that plaintiffs have fulfilled their obligation by an overwhelming margin. Our close review of plaintiffs' First Request For Production of Documents, finds it to be, at a minimum, succinct, appropriate, and narrowly tailored toward discovery of matters either relevant to the subject matter or, as is more likely the case, reasonably calculated to lead to the discovery of admissible evidence.

### C. *Defendant's General Objections*

 The aircraft defendants have alleged pat, generic, non-specific objections to each document request, repeating the familiar boilerplate phrase that each and every request is "vague, overly broad, unduly burdensome, and seeks information that is not relevant and not reasonably calculated to

lead to the discovery of relevant evidence" and, further, that each request "seeks information and material protected by the attorney client, work product doctrine or other privilege." These objections are denied for two reasons. First, as earlier discussed, the requests simply are not as characterized by the aircraft defendants. Second, the objections are inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure. See *Obiajulu v. City of Rochester*, 166 F.R.D. 293, 295 (W.D.N.Y.1996). An objection to a document request must clearly specify the objection and how that objection relates to the documents being demanded. *Roesberg v. Johns–Manville Corp.*, 85 F.R.D. 292, 297 (E.D.Pa.1980). The burden is on the party resisting discovery to clarify and explain precisely why its objections are proper given the broad and liberal construction of the federal discovery rules. *Obiajulu*, 166 F.R.D. at 297. The aircraft defendants have simply not done this, and as such their objections are denied.

Furthermore. a party invoking the claim of privilege has the burden of establishing all of its elements. *U.S. v. White*, 950 F.2d 426, 430 (7th Cir.1991). The discovery opponent must state the claim expressly and describe the nature of the document so withheld in a manner that will enable the other parties to assess the claim of privilege. *AM International, Inc. v. Eastman Kodak Co.*, 100 F.R.D. 255–256 (N.D.Ill. 1981); *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2nd Cir.1987). The aircraft defendants have not done so and this is fatal to this objection and claim. Fed. R.Civ.P. 26(b)(5). The mere naked claim of privilege, as occurs in this case, does not justify a refusal to identify or produce the information and documents requested. *Roesberg*, 85 F.R.D. at 302. The aircraft defendants have proceeded improperly in their objections based on privilege, since they have not identified the documents for which the claim is made nor supplied the information required under Fed.R.Civ.P. 26(b)(5). Also see, *Allendale v. Bull Data*, 145 F.R.D. 84 (N.D.Ill.1992); Judge Castillo's Order, In Re: Aircraft Disaster Near Roselawn, Indiana, dated November 21, 1996. Accordingly, any claims of privilege made by defendants to plaintiffs' First Requests for Production are denied.

## D. *Discovery Procedures Under the Hague Convention*

The aircraft defendants argue that plaintiff's discovery. namely First Request Nos. 6, 12, 25–30, 37–38, 40–54, 58–64, and 61–73, is subject to the Hague Convention discovery rules, and as such should not now be allowed. The basis for defendants' objections is what they perceive as a conflict between discovery under the Federal Rules of Civil Procedure and French evidence-gathering rules supervised by a French court. The aircraft defendants argue that the nation of France has an interest in this case, insofar as there are individuals acting at the behest of a foreign court gathering evidence in France without the involvement of the French courts. To defendants this seemingly violates "French conception of sovereignty." (Defendant's Opposition to Motion to Compel, at 21). For this proposition, defendants cite to *In Re Anschuetz*, 838 F.2d 1362, 1364 (5th Cir. 1988).

The aircraft defendants further argue that the U.S. Supreme Court has "admonished" that trial courts must exercise "special vigilance to protect foreign litigants' " from "intrusive" and unnecessary, or unduly burdensome discovery," citing to *Societe Nationale Industrielle Aerospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522, 545–546, 107 S.Ct. 2542, 2556–2557, 96 L.Ed.2d 461 (1987). The defendants want this court to proceed with discovery tinder the Hague Convention, and to acknowledge French Sovereignty interests by allowing the French civil code to control discovery of the documents found in France. The aircraft defendants assure this court that "France has specifically amended its civil code for the particular purpose of being able to handle letters of request pursuant to the Evidence Convention." (Aircraft Defendants Opposition to Motion to Compel, at 16).

Since both the discovery rules set forth in the Federal Rules of Civil Procedure and the Hague Convention on the Taking of Evidence are the law of the United States,

this court stands ready to and will exercise "special vigilance to protect the foreign litigants from the danger that unnecessary, or unduly burdensome discovery may place them in a disadvantageous position." *Aerospatiale,* 482 U.S. at 546, 107 S.Ct. at 2557; *Anschuetz,* 838 F.2d at 1362. As earlier discussed though, we do not perceive that any of the plaintiffs have inappropriately initiated any unfair, inappropriate, or uncalled for discovery; it appears just the opposite is true, with the defendants refusing to provide documents that are highly relevant to the very core issues of the case, let alone to the subject matter of the litigation. (supra, at 303–06). Further, we find nothing in this record showing that the Hague Convention discovery proceeding would prove any more effective than our current discovery process under the Federal Rules of Civil Procedure. Experience tells us just the opposite would be true with Letters Rogatory served in France. See *Aerospatiale,* 482 U.S. at 542, 107 S.Ct. at 2555. As such, we perceive no reason or useful purpose in this litigation to proceed with discovery under rules or procedures other than those the Federal Rules of Civil Procedure provide; nor is there any legal precedent to do other than that, as will be more fully discussed below.

It is easily apparent from applicable case law, that there is absolutely no valid reason or justification for abandoning the Federal Rules of Civil Procedure in favor of the Hague Convention method of discovery. Instructive is the holding of the U.S. Supreme Court in *Aerospatiale.* In that case, two aircraft manufacturers owned by the French Government attempted to require victims of an airplane crash to conduct discovery through the procedures of the Hague Convention. The United States Supreme Court held that the Hague Convention does not provide exclusive or mandatory procedures for obtaining documents or information located in a foreign signatory's territory. After reviewing the history of the Convention's ratification, as well as the plain language of the document itself, the court concluded that the Hague Convention was intended to establish only optional procedures for obtaining evidence abroad.

The court noted that the preamble of the Convention specifies that its purpose is "to facilitate the transmission and execution of Letters of Request" and to "improve mutual judicial co-operation in civil or commercial matters." *Aerospatiale,* 482 U.S. at 534, 107 S.Ct. at 2550. The court went on to observe that:

> The preamble does not speak in mandatory terms which would purport to describe the procedures for all permissible transnational discovery and exclude all other existing practices. The text of the evidence Convention itself does not modify the law of any contracting state, require any contracting state to use the Convention procedures, either in requesting evidence or in responding to such request, or compel any contracting state to change its own evidence-gathering procedures.

*Id.*

The Court in *Aerospatiale* pointed out that in the text of the three chapters of the Convention the drafters used permissive, rather than mandatory, language, and noted that "the absence of any command that a contracting state must use Convention procedures when they are not needed is conspicuous." *Id.* at 535, 107 S.Ct. at 2551.

■ We see that the Convention was intended as a permissive supplement, not a preemptive replacement, for other means of obtaining evidence located abroad. As the court noted:

> It seems patently obvious that if the Convention were interpreted as pre-empting interrogatories and document requests. the Convention would really be much more than an agreement on taking evidence abroad. Instead the Convention would amount to a major regulation of the overall conduct of litigation between nationals of different signatory states, raising a significant possibility of a very serious interference with the jurisdiction of United States Courts.

*Aerospatiale,* 482· U.S. at 539, 107 S.Ct. at 2553.

Finally, the court in *Aerospatiale* observed that "the Hague Convention did not deprive

the District Court of the jurisdiction it otherwise possessed to order a foreign national party before it to produce evidence physically located within a signatory nation." 482 U.S. at 539–540, 107 S.Ct. at 2553. Under the rationale of the *Aerospatiale* case, it is abundantly clear that discovery from the foreign defendants is not restricted to the procedures of the Hague Convention, nor should it.

■ *Aerospatiale* has been interpreted by lower courts to contain a three-part test in determining whether "to use the Hague Convention procedures in favor of the Federal Rules of Civil Procedure. In determining which methods of discovery to use, courts should consider: (1) the intrusiveness of the discovery requests given the facts of the particular case, (2) the Sovereign interests involved and, (3) the likelihood that resort to the Convention would be an effective discovery device. *Anschuetz*, 838 F.2d at 1364; *Great Lakes Dredge & Dock Co. v. Harnishfeger Corp.*, No. 89 C 1971, 1990 WL 147066, 1990 U.S. Dist. Lexis 12843 at 2. (N.D. Ill. 1990); *In Re Perrier Bottled Water Litigation*, 138 F.R.D. 348, 353 (D.Conn.1991) (citing *Aerospatiale*, 482 U.S. at 544, 107 S.Ct. at 2555–2556). Application of these guidelines fails to change our determination that discovery procedures should proceed according to the Federal Rules of Civil Procedure.

### 1. Nature of the discovery under the facts of this case

The standards set forth in Federal Rule 26(b)(1) permit discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the action." As directed in *Aerospatiale*, this court has and will continue to exercise special vigilance to protect the foreign aircraft defendants. In this regard, the court is closely supervising pretrial proceedings to prevent discovery abuses. *Aerospatiale*, 482 U.S. at 526, 107 S.Ct. at 2557. We earlier found that the discovery initiated by plaintiff was not intrusive, unnecessary, or unduly burdensome, but instead reasonably aimed at the core issues of liability. Moreover, plaintiffs' discovery appears to be initiated in contemplation of the court's expectations with respect to this

year's set trial date. As such, the Hague Convention procedures are not necessary in this case, and in fact if implemented, could well cause this matter to see the third anniversary of the Roselawn air crash disaster come and go with the end to the litigation not at all in sight.

### 2. The Sovereign Interests at issue

The aircraft defendants, in support of their refusal to produce the requested documents, argue that certain information is apparently protected from disclosure under French administrative law and that, therefore, France's sovereignty is at risk. The defendants also argue that the production of the information requested could "impinge directly on the integrity of a French sovereign regulatory function" which it maintains is not sanctioned by Seventh Circuit caselaw in instances where the information is marginally relevant. (Defendants' Opposition to Motion to Compel at 22). Aircraft defendants cite to *Reinsurance Co. v. Administratia Asigurarilor*, 902 F.2d 1275, 1280 (7th Cir.1990). We find, for several cogent reasons, not a modicum of persuasion in their argument.

First and foremost, the United States has its own sovereign interest in protecting its citizens. Manufacturers producing products abroad for use in United States are subject to the laws of the United States. An interpretation of the Hague Convention as the exclusive means for obtaining evidence located abroad, as defendants suggest, would effectively subject every American court dealing with a case involving a national of a contracting state to the internal laws of that state. *Aerospatiale*, 482 U.S. at 539, 107 S.Ct. at 2553. We find concern for the sovereignty rights of the United States if discovery for accidents occurring in the United States is limited by the internal law of another country.

■ Second, the defendants have not proven that French law is in jeopardy, nor have they established that the information sought is actually protected. More important, though, is that all privileged information is subject to protection under Federal Rule 26(b)(5). Using the Federal Rules would not force the production of protected documents

in any event. Foreign laws which protect documents, not otherwise protected by the Federal Rule, may nonetheless be raised in American courts and validated with a protective order, if appropriate.

Lastly, aircraft defendants' reliance upon *Reinsurance*, 902 F.2d 1275 (7th Cir.1990) is misplaced since the ruling in that case is inapposite to defendants' arguments and to the facts of this case. First, we have already found the record in this matter sufficient to support the legitimacy and need for plaintiff's discovery. We have determined that plaintiff's First Request to Produce is not just marginally relevant but, in fact, highly relevant to the issues of liability in this case. Second, *Reinsurance* involved Romanian laws barring discovery of "state secrets" and "service secrets." These laws were vigorously enforced with criminal sanctions. *Reinsurance*, 902 F.2d at 1279–1281. Additionally, the Romanian laws were directed at "domestic affairs" rather than merely protecting Romanian corporations from foreign discovery requests. *Id.* It was under these circumstances that discovery was not allowed. *Id.* at 1282. In contrast, the French Penal Code Law, No. 80–538 blocks disclosure of evidence in connection with foreign judicial proceedings. This French law was originally created to block United States antitrust laws and it has not been strictly enforced in France. *Aerospatiale*, 482 U.S. at 525, 527, 107 S.Ct. at 2546, 2547. In the instant matter, the foreign defendants have not clearly established that the information sought would, in fact. be in violation of the French administrative statute, nor that the administrative law is prosecuted to the extent that the Romanian law had been in *Reinsurance*. The record here offers no evidence that the information sought under the First Request for Production impinges on French sovereignty to any comparative degree as found in *Reinsurance*. We find the concerns of the United States in protecting its citizens from unsafe products outweighs any of the aircraft defendants' "sovereignty" concerns, if any really exist in the first place.

**3. The ineffectiveness of the convention in this matter**

The overriding interest of our court system is the just, speedy, and inexpensive determination" of litigation. *Aerospatiale*, 482 U.S. at 542–543, 107 S.Ct. at 2553. We find use of the Convention Letters of Rogatory to be an unnecessary. complicated, time consuming, and expensive means of discovery, thus thwarting the interests of our court system. *Id.* 482 U.S. at 542, 107 S.Ct. at 2551. This is especially the case where this court is making concerted efforts to expedite discovery, thereby avoiding the continuation of this litigation beyond the third anniversary of the instant tragedy. We find no useful purpose would be served to substitute effective and efficient discovery under the Federal Rules with the less than certain and burdensome Convention procedure. *Id.*

**4. Aircraft defendants' activities in the U.S.**

The aircraft defendants have established three corporate businesses in the United States which market and sell ATR–42 and ATR–72 aircraft namely, ATR SUPPORT, INC., ATR MARKETING, INC., and AEROSPATIALE, INC., all being named defendants. *A fortiori*, the requested documents are just as much in the possession and control of these domestic corporations as they are within the possession and control of their French-based counterpart. Thus, claims by aircraft defendants who are U.S. corporations for alternative foreign proceedings to what is found to be legitimate discovery, under the guise of some "French sovereignty" claim, are found as simply silly. Those aircraft defendants who, as a means of advancing their profit-making businesses in the United States, incorporated under the laws of the United States and then placed their planes in this country's stream of commerce, have little to complain about when served with enforceable discovery requests under the Federal Rules of Civil Procedure.

Finally, many of the documents sought from the aircraft defendants have made their way into the public domain during the FAA certification process of the ATR–42 and ATR–72, and during accident and incident reporting with the NSTB or FAA. These same documents are just as easily available for production in these proceedings under

the Federal Rules of Civil Procedure as they were when initially filed with the U.S. agencies, and as such they will be ordered to be produced forthwith.

We see no useful purpose, or legal precedent, for proceeding under the Hague Convention since to do so will ultimately delay and complicate these proceedings. We find all of defendants' objections to plaintiffs request for production of documents, based upon the Hague Convention procedure on taking evidence abroad in civil and commercial matters, to be without merit.

### III. *CONCLUSION*

For the foregoing reasons, PLAINTIFFS' MOTION TO COMPEL is hereby GRANTED. The defendants are hereby ordered to make full and complete production, disclosure, and response to Plaintiff's First Set of Requests for Production of Documents and Tangible Items within 10 days from the date of this order.